## AMERICAN PACIFIC WHALING CO. v. KRISTENSEN.

### No. 8581.

Circuit Court of Appeals, Ninth Circuit.
Nov. 19, 1937.

18

Frank Hunter, W. R. McKelvy, E. L. Skeel, Roberts & Skeel, and W. L. Grill, and Wright, Jones & Bronson, all of Seattle, Wash., for appellant.

James R. Gates and Schwellenbach & Gates, all of Seattle, Wash., and John C. Hogan and Clark W. Adams, both of Aberdeen, Wash., for appellee.

Before DENMAN, STEPHENS, and HEALY, Circuit Judges.

STEPHENS, Circuit Judge.

Plaintiff (appellee), as executrix, instituted suit pursuant to the provisions of 41 Statutes at Large, 1007 § 33 (46 U.S.C.A. § 688), commonly referred to as the Jones Act, to recover damages for the death of her husband, Harold B. Kristensen, who was killed in the performance of his duties as gunner on the corporate defendant's (appellant's) whaling boat. The plaintiff alleges negligence on behalf of defendant in the furnishing of a defective gun stem or mounting which broke upon discharge of the gun. Defendant appeals from judgment entered on the jury verdict in favor of plaintiff in the sum of $7,000.

Defendant denied any negligence on its part, and alleged that a latent defect, not discoverable by reasonable inspection, was the cause of the break. Defendant further alleged negligence of the deceased in overloading the gun and that he assumed the risk involved therein. The affirmative defenses were denied by the plaintiff.

A whaling gun of the type used on the occasion under consideration is mounted in a fork of a steel stem or pedestal which in turn fits into a socket secured to the vessel's deck. In aiming at a whale, the gun is turned from side to side by the stem turning in the socket. There is considerable recoil to such a gun, a part of which is absorbed in cylinders of glycerine. The stem is about eight inches in diameter just below the fork.

In the instant case the stem did not revolve well in the socket, and, notwithstanding the fact that the gun in seasons past had acquired a good record as a whale getter (not under Kristensen), trouble had developed in whaling seasons previous to the time of the accident to Kristensen. Witness Wester, one of defendant's employees, expressed the trouble in the stem as "kinking." He with others filed it and, quoting, "Then I tried it at the dock to see what it would do, reducing the amount of smokeless powder. After firing a few shots of smokeless powder, it went right back again the same old shape it was."

In fitting out the boat for the season of 1934 this stem was taken to the Lake Washington Shipyard, a reputable firm, and the problem of "taking the kink out" was turned over to this concern in the following circumstances: After the defendant had explained to them how the stem would stick in the socket, workmen for the shipyard micrometered the stem and found it to be out of true .005 to .008 or .009 of an inch. They advised that a thin layer of steel should be placed around the stem through a process of electrical welding of beads and that the stem could then be machined to fit the socket. This was done. After completion of this work with some filing in the fitting of the stem to the socket, Kristensen, as master and gunner of the ship, proceeded to the Alaskan whaling waters. Upon sighting a whale, the gunner fired but missed. The next day he fired again at a whale. This time the stem broke just under its fork, recoiled, and fell upon Kristensen's feet, knocking him to the deck so violently that he was instantly killed.

### The Defense of Assumption of Risk.

The defendant pleaded assumption of risk and introduced testimony upon that subject. He also objected to certain testimony and to certain instructions and reserved exceptions to certain rulings of the court upon that subject. But we shall not specifically comment upon any of them. The admission of any evidence and the giving of any instruction favorable ·to such defense constitutes an advantage to defendant to which he is not entitled for the reason that assumption of risk is not a defense under the Jones Act. This is the holding in The Arizona et al. v. Anelich, Administratrix (1936) 298 U.S. 110, 56 S. Ct. 707, 80 L.Ed. 1075; Beadle v. Spencer (1936) 298 U.S. 124, 56 S.Ct. 712, 80 L. Ed. 1082. Other specifications on this subject need not be mentioned.

### Negligence is the Gravamen of this Case.

The Jones Act (46 U.S.C.A. § 688), ·under which this action is brought, provides in part that: "* * * in case of the death of any seaman as the result of any such (injury received in course of employment) personal injury the personal representative of such seaman may maintain an action for damages at law with the right of trial by jury, and in such action all statutes of the United States conferring or regulating the right of action for death in the·case of railway employees shall be applicable."

The statute "conferring or regulating the right of action for death in the case of railway employees" referred to in the statute just quoted from is 35 Stat. 65 (45 U.S.C.A. § 51 et seq.), commonly called the Federal Employers' Liability Act, which reads in part as follows: "* * * in the case of the death of such employee, to his or her personal representative, for the benefit of the surviving widow or husband and children of such employee * * * for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars * * * appliances, machinery, * * * or other equipment." Section 1 (45 U.S. C.A. § 51).

It will thus be seen that negligence constitutes the gravamen of this case. Kunschman v. U. S. (C.C.A.-2, 1932) 54 F. (2d) 987. Defective appliances are not per

se due to the negligence of the employer, as in other cases in admiralty, and he is not liable for "any defect or insufficiency in plant or equipment that is not attributable to negligence." Delaware, etc., Ry. Co. v. Koske (1929) 279 U.S. 7, 10, 49 S. Ct. 202, 203, 73 L.Ed. 578.

We make no comment upon the defense of contributory negligence, since the defendant specifically withdrew that defense.

■ Since there was evidence from which the jury could draw the inference that the stem was weak and that defendant knew or should have known that it was weak, there was no error in presenting the issue of negligence to the jury.

### Does the Doctrine of Independent Contractor Apply to This Case?

■ The defendant assigns as error the court's refusal to instruct the jury as follows: "If you find that the defendant in selecting the Lake Washington Shipyard to repair the gun complained of in this case, used due diligence, then you are instructed that your verdict in this case must be for the defendant, regardless of whether or not you find that the Lake Washington Shipyard used due diligence under the circumstances in performing the work on the gun."

The refused instruction went much too far, even though we should agree that the evidence is all one way that the shipyard is an independent contractor, which we do not.

■■ It eliminated entirely the exception to the rule, i. e., that the employer is not relieved from imputation of negligence in cases presenting the principle of "dangerous instrumentalities." If the work done by an independent contractor has in it an inherent element of danger, and, through negligence of the contractor, proper provision has not been taken to guard against such danger, such negligence is imputed to the employer. If the work "from its nature, is likely to cause danger to others, there is a duty on his part to take all reasonable precautions against such danger, and he does not escape from liability for the discharge of that duty by employing the contractor, if the latter does not take these precautions." Penny v. Wimbledon Urban District [1899] 2 Q.B. 72, 47 Week. Rep. 565. See, also, St. Paul Water Co. v. Ware (1872) 16 Wall. 566, 21 L.Ed. 485; Jacob Doll & Sons, Inc. v. Ribetti (C.C.A.

3, 1913) 203 F. 593; Ohio Southern R. Co. v. Morey (1890) 47 Ohio St. 207, 24 N.E. 269, 7 L.R.A. 701; Richman Bros. Co. v. Miller (1936) 131 Ohio St. 424, 3 N.E.(2d) 360; City & Suburban Ry. Co. v. Moores et al. (1894) 80 Md. 348, 30 A. 643, 45 Am. St.Rep. 345. "There is an obvious difference between committing work to a contractor to be executed from which, if properly done, no injurious consequences can arise, and handing over to him work to be done from which, if properly done, no injurious consequences can arise, and handing over to him work to be done from which mischievous consequences will arise unless preventive measures are adopted." Bower v. Peate (1875–1876) 1 L.R.Q.B. Div. 321.

■ An expert metallurgist testified that the stem was weakened by the application of heat in the welding process. It is true that defendant claims this testimony should have been stricken upon the ground that there was no testimony that there was sufficient heat applied to cause a weakening through structural change of the steel, but we see it in a different light. The metallurgist's testimony amounted to an expression of his opinion that the fusing would require, and did require, the application of such heat. This testimony was sufficient to justify an inference that the break resulted from weakness caused by overheating, and this was properly left to the jury. The proffered instruction (No. 17) would have kept this from the jury.

The stem was not left with the shipyard with instruction to cure the certain defect in the workmanlike manner that expertness in the art would demand. The shipyard did not hold itself out as proficient in or possessing any knowledge of whaling gun stems or anything comparable thereto. The shipyard machinist foreman testified that the stem was sent to his concern, as he was informed by those who brought it, because it kinked and stuck in the socket; that it was found to be out of true. He told those who brought it to him how he could true it up and they "o.k." 'd it.

"* * * The object was not to strengthen the stem. * * * I had never added material by electric welding to any other gun fork stem. I do not know anything about the extent of the impact stress that this material was going to have to withstand, and I did not guarantee to the company nor give them my opinion as to

whether or not the gun fork stem would be of sufficient strength to do its required work when the job was completed. * * *"

In the face of this testimony it cannot be held, as a matter of law, that the shipyard was an independent contractor so as to excuse defendant from any result that might follow the work.

Another proposed instruction on this subject, which the court refused to give, was substantially covered by other instructions given.

### Other Assignments of Error.

Assignment V. Passages from textbooks were read to a witness on cross-examination and defendant assigns this as improper. This was permissible to test the knowledge, accuracy, and credibility of the witness. Clukey v. Electric Co. (1901) 27 Wash. 70, 67 P. 379; Wigmore (2d Ed.) § 1700; 22 C.J. 740, § 830; 82 A.L.R. 453.

Assignment VIII. This assignment goes to the question asked upon cross-examination as to whether, "if the stem was too weak to perform its duty," he would have recommended the particular treatment given the stem or would he "have recommended something else, annealing?" The objection to this question was, that it was outside the record. The defendant in answer to the objection argued that the gun had a good record as a whaling gun. This does not seem to us to be pertinent to the objection made or to the subject matter of the objection. The gun may have been accurate and powerful and at the same time the stem may have been too weak to hold up. The evidence is conclusive that it was. There is no reversible error here.

Assignment XIV. This assignment refers to a requested and refused instruction to the effect that ordinarily a person is not bound to know that which only an experienced metallurgist might know concerning metals. The argument is: How could the defendant know of the fatigue in the metal since the gun had been a successful one? The answer is obvious. The bending of the stem under usage was notice of the highest degree that something was wrong and it then became the defendant's duty to find out what was wrong.

We perceive no reversible error in the admission of testimony nor in relation to the instructions to which exceptions were taken.

It is apparent from what we have already said that the court rightly refused to grant defendant's motion for a directed verdict. Lumbra v. U. S. (1934) 290 U.S. 551, 54 S.Ct. 272, 78 L.Ed. 492.

Judgment affirmed.