The **ATLANTA CORPORATION**, a California corporation, Plaintiff,

v.

**Otto K. OLESEN**, individually and as Postmaster of the United States Post Office at Los Angeles, California, Defendant.

No. 17025–C.

United States District Court
S. D. California, Central Division.
Sept. 23, 1954.

Elaine B. Fischel, Los Angeles, Cal., for plaintiff.

Laughlin E. Waters, U. S. Atty., Max F. Deutz, Asst. U. S. Atty., Chief of Civil Division, Joseph D. Mullender, Jr., Asst. U. S. Atty., Los Angeles, Cal., for defendant.

JAMES M. CARTER, District Judge.

This is an action to enjoin the enforcement of a fraud order issued by the Postmaster General pursuant to §§ 259 and 732 of Title 39 U.S.C.A.

The proceedings in the matter, prior to this court action, had been lengthy. A complaint dated March 2, 1950, was on March 7, 1950, served on Alice J. Frost, the president of Atlanta Corporation, plaintiff herein, and the matter finally came to hearing on March 15, 1951, before the Post Office department under No. F & L Docket 19/106. A transcript

of 479 pages resulted from this hearing. The complaint in No. 19/106 was dismissed on motion of Atlanta for failure of the Post Office department to comply with the Administrative Procedure Act, 5 U.S.C.A. § 1001 et seq.

On August 20, 1952, a new complaint under Hearing Examiner Docket No. 1/334 was filed and subsequently served on Alice Frost, President of Atlanta. At the hearing on No. 1/334 on November 17, 1952, the transcript of the previous hearing with certain reservations and exceptions was made the record for No. 1/334 with leave to introduce further evidence.

Following the hearing of November 17, 1952, Atlanta waived the presentation of any further evidence and elected to stand on the record made as of November 17, 1952. Thereafter both sides proposed findings and the examiner made his "Initial Decision" on January 28, 1954. We understand this Initial Decision constitutes the findings in the case.

An appeal was taken to the Postmaster General. Both sides filed briefs. On August 5, 1954, the Deputy Postmaster General "adopted and affirmed" the findings of facts and conclusions of law, (i. e. the Initial Decision of the examiner) as the decision of the Post Office department and provided that the fraud order issue.

On August 5, 1954, Fraud Order No. 55704 issued. On August 11, 1954, the present action was filed in this court seeking to enjoin the enforcement of the fraud order.

In the complaint in H. E. Docket 1/334 the Solicitor of the Post Office department alleges that "a fraudulent scheme is being conducted *in violation* of 39 U.S. Code §§ 259 and 732 * * * by means of false and fraudulent pictures, representations and promises." [Emphasis added.]

■ We pause to note that there can be no *violation* of the sections referred to. They merely *authorize* in certain instances, the issuance of fraud orders. They contain no penalties nor do they state offenses under the federal law.

The penal section, 18 U.S.C.A. § 1341 (formerly 18 U.S.C.A. § 338) although enacted for a different purpose contains the essential elements of a mail fraud. Although we would be inclined to use 18 U.S.C.A. § 1341, the mail fraud statute, as defining exactly the nature of the violation allegedly committed by Atlanta, the many cases based on §§ 259 and 732 of 39 U.S.C.A. preclude us from a detailed consideration of this point.

As Justice Holmes stated in his dissent in Leach v. Carlile, 1922, 258 U.S. 138, 140, 42 S.Ct. 227, 228, 66 L.Ed. 511, "The statute under which fraud orders are issued by the Postmaster General has been decided or said to be valid so many times that it may be too late to expect a contrary decision."

The government has answered the order to show cause by the filing of a transcript certifying "that the annexed papers are true papers of the original documents on file in this Department." That transcript does not contain all the exhibits offered at the first hearing, which were carried over by the stipulation into the second. However, as appears below we are able to dispose of the case without too much concern over the missing exhibits.

Atlanta makes three major contentions:

1. That the decision is not supported by substantial evidence;

2. That there is no proof of intent to defraud;

3. That there was a procedural lack of due process, (a) in that the examiner refused to receive evidence which had a substantial bearing on the question of intent to defraud, and (b) because of the examiner's refusal to permit the use of medical books and treatises in the direct examination of witnesses.

I

The device in question is one used externally, consisting of two plastic cups fitted with edges of soft rubber to be placed against a female's breasts, connected by a rubber hose which can be fastened to a water faucet.

Water is then run through the hose, but does not contact the skin of the person using the device. By the use of a finger or thumb on an exposed end portion of the hose, other than that through which the water runs, the flow of the water causes alternate suction within the plastic cups, which then alternately suck the breasts into the device and release them.

The claims of Atlanta as to the efficacy of its device are generally, that the device, used as directed, would "greatly beautify the breast" of any woman who has "undeveloped or sagging breasts * * * except in extreme cases of sagging"; that exercise time varies from five to fifteen minutes per day on each side depending on particular conditions; that the exercise brings "additional circulation to the breast"; that "circulation is the body's normalizer"; that the device would "beautify your breast to your complete satisfaction"; that "You, too, may become a Lady Bountiful * * * a title * * * synonymous with perfection of the divine form."

There is no contention that the device is harmful to the health of the individual; the sole contention of the government is that Atlanta's claims are unsupported and that the device will have no effect upon improving the size, contour or firmness of the breasts. The two medical experts who testified for Atlanta at the hearing, set forth Atlanta's theory as to the efficacy of the device, namely that the breasts are fat depots, that is, places where fat might be deposited, and that the alternate sucking action of the cups increases the circulation of the blood and increases thereby the fatty deposits in the breasts; and that the action of the device is equivalent to massage, which is beneficial to the breasts.

Nowhere in the examiner's initial decision does he even as much as hint at Atlanta's theory as to the basis upon which the device was efficacious. Although the two medical experts called by the Post Office department and the two called by Atlanta were definitely in conflict as to the beneficial effects of the use of the device, they were in agreement on certain other points. The government experts conceded that the device would cause an increased flow of blood to the breast; and that muscle tissue can be increased in size by exercise. But the government experts contended there is no muscle tissue in the breast except a small amount in the nipple.

The experts also conceded that the operation of the device might be classified as a form of massage, in that it might do what massage might do; it might stimulate circulation at the affected part at the time of application and for a short time after the massage or suction had been applied; that the device may have the effect of a deep massage as well as a surface massage; that fat cells are normally present all over the body at birth; that they may end up full of fat; that fat is deposited in various parts of the body as more fat becomes available; that the operation of the device would create a temporary hyperemia, that is, an increased flow of blood to the skin; that the purpose of massage is to retain the tone of the muscle structure and to carry away the products of metabolism that are going to accumulate through lack of action; that massage is a relaxing treatment; that fat deposits are carried into the breast area probably by the lymph stream but that is a question that has never been settled to complete satisfaction; that the cellular elements of the fatty tissue are fed by the circulation of the blood; that a cell would be destroyed by lack of circulation; that cells become larger as a result of exercise.

Notwithstanding these statements or admissions by the government experts, the experts flatly declare that the device would have no beneficial effect upon a small or flabby breast, while the experts for Atlanta gave their opinion that the device would increase the size of small breasts and firm up and give better shape to flabby breasts.

In American School of Magnetic Healing v. McAnnulty, 1902, 187 U.S. 94, 23 S.Ct. 33, 47 L.Ed. 90, the court set aside a fraud order, pointing out that

there were two widely held schools of opinion as to whether the mind could affect bodily diseases, and that scientific knowledge had not advanced to the point where an actual intent to deceive could be attributed to one who asserted either opinion. Thus there was, 187 U.S. at page 104, 23 S.Ct. at page 37, "no exact standard of absolute truth by which to prove the assertion false and a fraud." At best, testimony either way was held to be no more than "opinion" in a field where imperfect knowledge made proof "as of an ordinary fact" impossible.

Reilly v. Pinkus, 1949, 338 U.S. 269, at page 274, 70 S.Ct. 110, at page 113, 94 L.Ed. 63, limited the holding of the McAnnulty case, but stated:

"* * * But we do accept the McAnnulty decision as a wholesome limitation upon findings of fraud under the mail statutes when the charges concern medical practices in fields where knowledge has not yet been crystallized in the crucible of experience. For in the science of medicine, as in other sciences, experimentation is the spur of progress. It would amount to condemnation of new ideas without a trial to give the Postmaster General power to condemn new ideas as fraudulent solely because some cling to traditional opinions with unquestioning tenacity."

■ It is probably an understatement to say that the female breast, throughout recorded history, has inspired the admiration of men and women alike. The Greeks built statues, and later civilizations painted pictures to glorify the female breast in various forms and shapes. Literature abounds with references to this part of the female anatomy. At different stages in European and American culture, different shapes and sizes of the human breast were in style, as witness the round, robust breast of the Renaissance, the neat, compact breast of Vogue magazine, the new Dior look and the voluptuous contours of the minor character in Jack Webb's "Dragnet." The court takes judicial notice, based upon the common knowledge of mankind, that women historically have been, and presently are interested in improving their appearance for the purpose of their own morale and for the effect upon the male segment of the population. The brassiere is one device that has been commonly utilized to perfect women's appearance, to say nothing of the falsie, the corset or the sweater.

If the device here was harmful in its operation, or if there was involved some substance taken internally, we would be far more concerned than we are on this present record. Women will continue to *attempt* to improve their appearance, including the appearance of their breasts, regardless of fraud orders issued by the Post Office Department, and regardless of decrees of this court.

It is conceded by the government experts that the device constitutes a surface and deep massage. We could spell out a chain of logic that would probably be as convincing as that used by the examiner in his initial decision, somewhat along the following lines:

(1) All human beings have hair on their heads;

(2) From time immemorial, the hair of the head has been brushed, stroked or massaged;

(3) It is common knowledge that the best heads of hair are those which are most often brushed, stroked or massaged;

(4) We come then to the unknown equation,—Does the fine head of hair result from brushing, stroking or massaging, or is it a fine head of hair because it is more often brushed, stroked or massaged? Without definitely answering the unknown equation, we have the impression there is an application of the principle of cause and effect, and that massage may be helpful to the appearance of the hair of the head. Quod in uno simillium valet valebit in altero. (That which is effectual in one of two like things shall be effectual in the other.) Commentary on Littleton by Sir Edward Coke.

Since, as appears hereafter, there was procedural error in the hearing before the examiner constituting lack of due process, and since therefore the fraud order must be set aside, we are not called upon to rest decision upon solution of the interesting problem presented by Atlanta's contention as to the lack of substantial evidence.

## II.

■ Atlanta contends there was no proof of intent to defraud and that there was error in the examiner's refusal to permit Atlanta to offer evidence on the question of intent to defraud. Reilly v. Pinkus, supra, disposes of this problem. There the court said, 338 U.S. at page 276, 70 S.Ct. at page 114:

"* * * Proof of fraudulent purposes is essential—an 'actual intent to deceive.' See Seven Cases v. United States, 239 U.S. 510, 517, 36 S.Ct. 190, 193, 60 L.Ed. 411. Consequently fraud under the mail statutes is not established merely by proving that an incorrect statement was made. * * *" Jeffries v. Olesen, D.C.S.D.Cal.1954, 121 F. Supp. 463.

Miss Frost, President of Atlanta, was interrogated by her counsel, and an attempt was made to prove that she had worked with some 200 doctors in California. She was asked, "if any of these doctors advised you that the instrument actually could not attain results which you advertised" and objection was sustained. An attempt was made repeatedly to secure from her statements made to her by doctors as to the efficacy of the device, and counsel for Atlanta repeatedly pointed out that the testimony was elicited solely on the issue of intent and not as substantive evidence of the efficacy of the device, but the examiner refused to permit her to testify. He stated "that she could testify that she consulted doctors concerning the efficacy, that is all"; that he would not "let anybody testify on what the doctors have told even on issues of intent because then you have got confusion in the record as to what your medical testimony is."

Of course, testimony admitted for the limited purpose of proving intent should not confuse the examiner, and he would have no need to consider it on the question of efficacy. It would serve no purpose to point out where in the record Atlanta repeatedly attempted to get this evidence before the examiner and was prevented from doing so.

■ Likewise Miss Frost was asked whether she had ever received a complaint from one of her patients to the effect that the instrument did not attain the results advertised, and the objection was sustained. Although advice of doctors and complaints or lack of complaints would have no bearing on the other issues in the case, they would clearly be relevant to the issue as to the intent of Atlanta in using the mails to sell the device in question, and admissible, notwithstanding the hearsay rule.

Wigmore on Evidence, 3rd Edition, § 1766, Vol. 6, p. 177, states: "If therefore an extrajudicial utterance is offered not as an assertion to evidence the matter asserted but *without reference to the truth of the matter asserted* the Hearsay rule does not apply." [Emphasis in text.] And in § 1789, Vol. 6, p. 235, "Wherever an utterance is offered to evidence the *state of mind* which ensued in *another person* in consequence of the utterance, it is obvious that no assertive or testimonial use is sought to be made of it and the utterance is therefore admissible so far as the Hearsay rule is concerned." Hawkins v. United States, 5 Cir., 1923, 293 F. 586; Emich Motors Corp. v. General Motors Corp., 7 Cir., 1950, 181 F. 2d 70 at page 82 (citing Wigmore), modified on other grounds 340 U.S. 558, 71 S. Ct. 408, 95 L.Ed. 534; Smedra v. Stanek, 10 Cir., 1951, 187 F.2d 892, 894; International Longshoremens etc. Union v. Juneau Spruce Corp., 9 Cir., 1951, 189 F.2d 177, 191–192, affirmed 342 U.S. 237, 72 S.Ct. 235, 96 L.Ed. 275; Ohio Associated Tel. Co. v. N.L.R.B., 6 Cir., 1951, 192 F.2d 664, 666–667 (citing Wigmore); Mabry v. Travelers Ins. Co., 5 Cir., 1952, 193 F.2d 497, 498.

488

■ Atlanta also complains that nine fairly detailed affidavits by California doctors, who had either used or prescribed the device for their patients, were not admitted in evidence. A search of the record shows these affidavits were originally attached to a motion made in the prior proceeding under F & L Docket No. 19/106. Somehow they became separated from that motion. The motion however, was made in the prior proceeding and was not re-filed in No. 1/334. Nowhere in the record does it appear those affidavits were offered in evidence in No. 1/334. We do not reach the question of whether they would have been admissible had they been offered.

### III.

■ Finally, Atlanta contends that it was prevented from using medical books and treatises during the course of its direct examination of its expert witnesses. We think the examiner's ruling was correct. There is a major distinction between the use of medical text and treatises on direct examination and on cross. Gluckstein v. Lipsett, 1949, 93 Cal.App.2d 391, 403, 209 P.2d 98, states the rule in California is the same as the general rule in other jurisdictions. In the trial of an action, an expert witness on direct, will ordinarily be permitted to name and to testify that he relied on certain medical texts or treatises in formulating his opinion, and to cite them as reasons for his opinion but he should not be permitted to read from the text or treatise, since they are by the great weight of authority not admissible in evidence on direct examination. Mississippi Power & Light Co. v. Whitescarver, 5 Cir., 1934 68 F.2d 928, 930–931; United States v. One Device etc., 10 Cir., 1947, 160 F.2d 194, 198–199.

■ On cross-examination however, a different rule is involved. Reading portions of medical texts or treatises in connection with the cross-examination of the expert witness is permissable "to test the knowledge, accuracy, and credibility of the witness", American Pacific Whaling Co. v. Kristensen, 9 Cir., 1937, 93 F.2d 17, 21; Lewis v. Johnson, 1939, 12 Cal.2d 558, 562, 86 P.2d 99, and to ascertain whether or not he agreed or disagreed with the opinions expressed.[1]

■ In the present case the matter arose on Atlanta's direct examination of its own experts and there was no error in the ruling by the trial examiner.

### Conclusion

Since the issue of intent is involved in a Post Office order based upon fraud, it is obvious that respondents in such a proceeding should have the right to introduce evidence bearing on the question of intent and the failure of the examiner to permit the introduction of such evidence, expressly limited to the question of intent, was error; and since it went to the very heart of Atlanta's defense to the proceeding the ruling was prejudicial and constituted lack of procedural due process of law.

The Post Office Department has many duties to perform and its tasks are not easy, but as Judge Arnold remarked in Esquire Inc., v. Walker, 1945, 80 U.S. App.D.C. 145, 151 F.2d 49 at page 55, affirmed Hannegan v. Esquire, 327 U.S. 146, 66 S.Ct. 456, 90 L.Ed. 586:

"We believe that the Post Office Officials should experience a feeling of relief if they are limited to the more prosaic function of seeing to it that 'neither snow nor rain nor heat nor gloom of night stays these couriers from the swift completion of their appointed rounds.'"

An order will issue granting a preliminary injunction pendente lite restraining the local Postmaster from enforcing the fraud order.

1. In Dolcin Corp. v. Federal Trade Comm., D.C.Cir., —— F.2d ——, the trial examiner ruled that medical publications could be used on cross-examination, only if the witness had relied upon them in his direct examination. Held, error but not such as to warrant reversal. The publications touched only indirectly on the central issue.

The court also spells out a plausible argument for the use of authoritative scientific writings on direct, in hearings before administrative agencies.