# 1077

MARK EDEN, a California corporation,
Plaintiff-Appellee,

v.

Lim P. LEE, as Postmaster of the United
States Post Office at San Francisco,
California, Defendant-Appellant,

and

S. Victor Wagler, as Trustee of certain
impounded funds, Defendant.

No. 24118.

United States Court of Appeals,
Ninth Circuit.

Nov. 3, 1970.

Walter H. Fleischer (argued), William
D. Ruckelshaus, Asst. Atty. Gen., Cecil
F. Poole, U. S. Atty., Alan S. Rosenthal,
Stephen R. Felson, Washington, D. C.,
for defendant-appellant.

John F. Wells (argued), Nathan G. Gray, Stark, Simon & Sparrowe, Oakland, Cal., for plaintiff-appellee.

Before MERRILL and HUFSTED-LER, Circuit Judges, and *JAMESON, District Judge.

JAMESON, District Judge:

This is an appeal from a summary judgment in favor of plaintiff-appellee, Mark Eden, enjoining defendant-appellant, Lim P. Lee, the Postmaster at San Francisco, California, from enforcing a decision and impound order of the Acting Judicial Officer of the United States Post Office Department.[1]

### Background of Litigation

Mark Eden, a California corporation, manufactures and sells a mechanical exercising device known as the Mark Eden Developer, designed to aid in the development of the female bust. In March, 1965 Mark Eden began to market the device through the mails and published its "First Ad" in several national magazines.[2] This ad contained a guarantee "to any woman that she will gain at least three full inches on her bust" by using the device and following the Mark Eden program.

On April 21, 1965 the Post Office Department commenced a fraud order proceeding against Mark Eden pursuant to 39 U.S.C. § 4005. Shortly after this proceeding was instituted the First Ad was discontinued and replaced with a somewhat more conservative advertisement, the so-called "Barbara Hayes Ad." This ad was used until January, 1967.

A hearing was held in May, 1965 on the fraud order. The Hearing Examiner did not find an "actual intent to deceive" by false representation—essential to the issuance of a fraud order.[3] He did, however, find that certain representations tended to raise doubts about Mark Eden's complete good faith and suggested several changes which should be made. The Judicial Officer of the Post Office Department reversed and issued a fraud order in November 1966, and Mark Eden's mail was impounded. Mark Eden obtained a temporary restraining order in district court enjoining enforcement of the fraud order.

Following protracted negotiations the parties agreed upon a settlement. The terms of the settlement are set forth in an Affidavit of Discontinuance executed by the owners of the capital stock of Mark Eden on January 30, 1967. Following the execution of the Affidavit, Mark Eden began using its third advertisement, known as the "Compliance Ad," and on February 7, 1967 ordered all of its publishers to publish this ad in place of all other advertisements.

In the settlement negotiations, Mark Eden was represented by its counsel, John F. Banker, and the Post Office Department by its counsel, Abraham Levine. Prior to execution of the Affidavit Banker sought assurance from Levine that the proposed Compliance Ad would be an acceptable advertisement and comply with the provisions of the proposed settlement agreement. Levine in a letter dated December 7, 1966 states:

" * * * [W]e are not authorized to review proposed advertising copy

---

* Honorable William J. Jameson, United States Senior Judge, Billings, Montana, sitting by designation.

1. The trustee of the impounded moneys was a party defendant in the district court, but did not appeal.

2. Four basic advertisements have been used:

| Ad Name | Published |
| --- | --- |
| 1. First Ad | March–April 1965 |
| 2. Barbara Hayes Ad | April 1965–January 1967 |
| 3. Compliance Ad | January 1967–March 1968 |
| 4. Revised Compliance Ad | March 1968 to date |

3. See Reilly v. Pinkus, 1949, 338 U.S. 269, 276–277, 70 S.Ct. 110, 94 L.Ed. 63.

for an express or implied approval. I would be willing, however, to examine such proposed copy and advise you if any portion thereof presents a problem. I would undertake this with the stipulation that any comments submitted would not bind the General Counsel Office in any future action taken with respect to such proposed advertising."

On January 3, 1967 Banker sent Levine a copy of the proposed Compliance Ad, with blank spaces for photographs and quotations from letters from customers. The Associate General Counsel replied on January 12. Without commenting on the advertisement he proposed a number of changes in the Affidavit, including a recital that:

> " * * * the General Counsel's office has not reviewed, screened, or evaluated any advertising matter submitted or exhibits by [Mark Eden] or its attorneys, nor has the General Counsel's office indicated or suggested any express or implied approval or acceptance of such advertising matter."

This provision was incorporated in the affidavit.

Banker testified before the Hearing Examiner in the present litigation that in a telephone conversation on January 19, 1967, Levine "stated that he was required to follow the Department policy against approving specific ads and that he could not vary that policy in our case. He stated, however, that he had in fact reviewed the form of advertisement sent him by us and that if there had been anything in that form of advertisement which he felt was seriously objectionable, he would have so informed us." [4]

4. Levine, although present, did not testify before the Hearing Examiner.

5. Of $400,000 impounded, approximately $3,000 represented funds received as the result of the First Ad. These were refunded by Mark Eden to the purchasers. The remaining funds, representing receipts resulting from the Barbara Hayes Ad, were retained by Mark Eden. The agreement provided that the approval of the Affidavit by the General Counsel

*Settlement Agreement*

The settlement agreement, embodied in the Affidavit of Continuance, recites that the "advertisement complained against," i. e., the First Ad, had been discontinued and provided that Mark Eden would not fill any orders based on that advertisement and that any remittances thereafter received would be returned to the purchaser with the statement that the advertisement had been discontinued and orders relating thereto were no longer being filled. Upon approval of the Affidavit by the General Counsel's Office, the fraud order and temporary restraining order would be revoked, and the impounded funds released to Mark Eden for the same disposition as new orders based on the discontinued advertisement.[5]

With respect to future advertisements, the Affidavit provided:

> "3. It is agreed that future advertising matter employed by Respondent or the undersigned will not contain any representation, whether expressly stated or reasonably implied from express statements, or reasonably implied from the advertisement as a whole, including any pictorial display or other advertising device therein contained to the effect that:
>
> (a) Every female user of the 'Mark Eden' device and exercise program is assured some degree of development or enlargement of the female breasts;
>
> \* \* \* \* \* \*
>
> (c) The use of aforesaid product will assure the female user of results in breast development or enlarge-

"shall not be construed as approval of affiant's current advertising" i. e., the Barbara Hayes Ad; nor should the execution of the Affidavit be construed "as constituting an admission by (Mark Eden) of any impropriety in the past use of the advertising \* \* \* agreed to be discontinued, the purpose of this affidavit being to compromise and settle the conflicting contentions of the parties to this proceeding."

ment to the extent of specifically stated proportions or measurements;

(d) The use of aforesaid product will assure the female user of results in the development or enlargement of her breasts equivalent to that depicted by any illustration, model, or other demonstration."

Paragraph 5 of the Affidavit prescribes the procedure to be followed if the Post Office Department received evidence showing a breach of the Affidavit. It provides that the Department may apply for a fraud order and that Mark Eden "may at any time prior to * * * hearing revise its advertising matter consonant with the charges of alleged breach * * *. Pending a hearing on the matter of breach, the Judicial Officer of the Department may order the mail of the Respondent (Mark Eden) to be impounded * * * provided, however, that any mail relating to the alleged breach which is so impounded shall upon the request of Respondent be ordered released to Respondent upon the condition that Respondent deposit all * * * remittances therein contained, in trust, with a responsible trustee. Upon a hearing and determination on the question of breach, the hearing examiner shall order appropriate distribution of the funds so deposited in trust. * * *"

### Present Litigation

The Compliance Ad was first published in March, 1967. During that month the Post Office Department began a further investigation of Mark Eden's advertising. Banker wrote Levine and was informed that the investigation related to "compliance with the Affidavit of Discontinuance." On April 10, 1967 Banker transmitted to Levine and the Post Of-

fice Inspector conducting the investigation a copy of the full Compliance Ad. This investigation was terminated and the file marked "Closed" sometime in April, 1967.[6]

On December 12, 1967 the Post Office Department moved for the issuance of a fraud order and for an order impounding Mark Eden's mail, on the ground that new advertising had come to its attention which violated the terms of the Affidavit.[7] On December 15 the Judicial Officer ordered the impounding of Mark Eden's mail, with delivery to be conditioned upon incoming funds being placed in trust. Following a suspension of the order pending negotiations, the order was reinstated on January 24, 1968. Approximately $900,000 is now held in the trust fund. On March 7, 1968 Mark Eden revised its advertisements, discontinued the use of the Compliance Ad, and began using its Revised Compliance Ad.[8]

Following a hearing, the Hearing Examiner rendered his decision on March 21, 1968, finding that "a preponderance of the evidence fails to show that the respondent has violated the Affidavit of January 30, 1967 in respect to any items specified or referred to in complainant's motion of December 12, 1967." On appeal by the Department, the Acting Judicial Officer on April 30, 1968 reversed the Hearing Examiner in part and held that paragraph 3(a) of the Affidavit, quoted supra, had been violated by Mark Eden's subsequent advertisements. He found from samples of the Compliance Ad received as exhibits, that Mark Eden "did and does represent * * * that 'every female user of the "Mark Eden" device and exercise program is insured some degree of develop-

---

6. See In the Matter of Mark Eden, Post Office Department Division of Hearing Examiners, P.O.D. Docket No. 2/204A, March 21, 1968 at 3 (unreported).

7. This was the Compliance Ad which had then been in use for 11 months, and is the same ad in use at the time of the investigation in March and April, 1967.

8. The $900,000 in the trust fund represents the receipts from more than 90,000 orders received subsequent to January 24, 1968 as a result of the Compliance Ad. No receipts from the Revised Compliance Ad were impounded. All orders were filled by Mark Eden, and apparently any dissatisfied customers received their refunds under the company's guarantee.

ment or enlargement of the female breasts.' " [9]

He agreed with the Hearing Examiner that other allegations of breach of the terms of the Affidavit had not been established and held that the new advertising i. e., the Revised Compliance Ad,[10] did not violate the Affidavit.

The Acting Judicial Officer ordered all funds which had been or would be sent to Mark Eden in response to the offending advertisements returned to the senders with a statement that such advertising had been discontinued and orders would no longer be filled. Any remittances not identified with this advertising could be retained by Mark Eden.

After the denial of its motion for reconsideration,[11] Mark Eden brought this action to enjoin enforcement of the impound order. Each party moved for summary judgment. The district court granted judgment in favor of Mark Eden

---

9. The Compliance Ad reads:

**THROUGHOUT AMERICA WOMEN ARE REPORTING AMAZING GAINS ON THEIR BUSTLINES BY USING THE FABULOUS MARK EDEN DEVELOPER**

Here are inserted "Before" and "After" pictures and testimonials of customers.

The following then appears in finer print:

"*What is the Mark Eden Method?* The Mark Eden Method is not a cream, not an artificial stimulator. It is an exerciser that employs special techniques, safely and effectively, with hundreds of women throughout America reporting remarketable results in enlarging, shaping, and firming the bustline.

"*The Price of Only $9.95 is Complete.* You receive the Mark Eden Developer backed by the Mark Eden MONEY BACK GUARANTEE. You get a complete course of instructions in the use of this developer illustrated by photos of June Wilkinson, 'The girl with the world's loveliest bustline,' showing the exact program she personally recommends.

"*The Mark Eden Exclusive Guarantee of Satisfaction.* The degree of effectiveness of the Mark Eden Developer turns in part upon physical factors which vary among individuals. If the Mark Eden Developer does not produce for you the results which have delighted so many of our customers, this guarantee is your protection: If after using the Mark Eden Bustline Developer and Course for only two weeks, you do not see a significant difference in your bustline development, simply return the developer and the course to Mark Eden and your money will be promptly refunded."

The return coupon reads:

"Please send me my Mark Eden Developer and Guaranteed Bustline Contouring Course illustrated by June Wilkinson. I understand that this course is complete and that there will be nothing else to buy, and that if I do not see satisfactory results in bustline development within two weeks, I can return everything to Mark Eden and receive my money back."

10. In the Revised Compliance Ad the first portion was changed to read:

**MORE AND MORE WOMEN ARE REPORTING AMAZING GAINS ON THEIR BUSTLINES BY USING THE FABULOUS MARK EDEN DEVELOPER**

"Before" and "After" pictures and testimonials similar to those in one of the Compliance Ads were inserted.

The following paragraph was added in the text below:

"*IS EVERY WOMAN ASSURED SOME RESULTS WITH THE MARK EDEN DEVELOPER?*

"No, it would be impossible to assure every woman that she will achieve specific proportions, measurement increases, or results. However, hundreds of women have been thrilled beyond their expectations and are proudly reporting outstanding gains on their bustlines, often in just a matter of weeks, with this remarkable developer."

In the return coupon the word "Guaranteed" was omitted before the words "Bustline Contouring Course."

11. In its motion for reconsideration, Mark Eden sought to offer proof that the order was inconsistent with the parties' "previous disposition of funds" and that the customers were satisfied and did not want their money back. In denying the motion, the Judicial Officer stated that the only questions at issue were (1) whether the Respondent's advertising meets the requirements of the Affidavit, and (2) "if not, whether a fraud order or some lesser penalty should be levied * * *." He held that, "No distinctions need be drawn * * * between the various categories of remitters—satisfied and dissatisfied, trusting and skeptical, or those who actually demanded refund and those who did not."

and ordered the impounded funds released to it.

The district court accepted most of the findings of the Hearing Examiner and rejected those of the Acting Judicial Officer. He concluded that "the only reasonable and fair inferences and findings and conclusions of law that can be drawn from the record are those made by the Hearing Examiner of the Post Office Department * * * " and that "the decision of the Department, based upon the findings and conclusions of law of the Acting Judicial Officer, is arbitrary and unjustly penalizes plaintiff for its reliance upon an understanding of its agreement induced and encouraged by the action of the Department."

It is the position of appellant that the decision of the Post Office Department was supported by substantial evidence, the district court applied the wrong standard of review, and under the proper standard, the decision of the Department should be upheld. Appellee contends that (1) under the settlement agreement as interpreted by the parties themselves there was no breach; (2) even limiting consideration to the Affidavit of Discontinuance and the advertisements, the Compliance Ad "did not imply an assurance to every reader of some results"; and (3) the refund order was improper, arbitrary, capricious, and in conflict with the parties' prior disposition of impounded funds.

### Scope of Review

■ When a fraud order has been issued under 39 U.S.C. § 4005, the court, in reviewing the decision of the Judicial Officer, must "consider all the contents of the advertisements and letters, and all of the evidence * * * to determine if there was evidence to support the * * findings of fraud." Donaldson v. Read Magazine, 1948, 333 U.S. 178, 186, 68 S.Ct. 591, 596, 92 L.Ed. 628. The requirement for canvassing "the whole

record" does not mean that "even as to matters not requiring expertise" a court may displace the agency's choice "between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*." The court is not barred, however, from setting aside the decision "when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed" to the Agency's view. Universal Camera Corp. v. N. L. R. B., 1951, 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456. The record to be reviewed includes the examiner's report which should be given "such probative force as it intrinsically commands." 340 U.S. at 496–497, 71 S.Ct. at 468.

■ The provisions of the Administrative Procedure Act relating to judicial review are applicable.[12] Under this Act a court shall "hold unlawful and set aside agency action, findings, and conclusions found to be—(A) arbitrary, * * * or otherwise not in accordance with law; * * * (E) unsupported by substantial evidence" 5 U.S.C. § 706(2). The proponent of an order has the burden of proof. 5 U.S.C. § 556(d).

As noted supra, ordinarily in a postal fraud proceeding under section 4005 it is necessary to find "an actual intent to deceive" before a fraud order may be issued. Moreover, the power conferred upon the Postmaster General to impound and refuse to deliver mail to persons conducting fraudulent schemes must be "zealously watched and strictly confined." Kirby v. Shaw, supra, 358 F.2d at 449.[13]

There is no real dispute with respect to the applicability of these rules to the ordinary postal fraud case. In the administrative proceedings, as well as in the district court, however, it was expressly recognized that this is not an

---

12. See Kirby v. Shaw, 9 Cir. 1966, 358 F.2d 446, 449, and cases therein cited.

13. Citing Hannegan v. Esquire, Inc., 1946, 327 U.S. 146, 156, n. 18, 66 S.Ct. 456, 90 L.Ed. 586.

ordinary postal fraud proceeding, but rather a proceeding to determine whether there has been a breach in the settlement agreement as contained in the Affidavit of Discontinuance.[14] We are not concerned with the question of whether there were fraudulent representations with intent to deceive,[15] but rather with the interpretation of the settlement agreement, and specifically (1) whether the language in the Compliance Ad constituted a breach of that agreement, and (2) whether the judicial officer was justified in entering an order providing for the refund of the impounded funds. There is no dispute with respect to the facts regarding use of the various advertisements or the facts related by Banker regarding settlement negotiations; nor is any question of credibility of witnesses involved.[16]

### Finding of Breach

The Judicial Officer found a violation of paragraph 3(a) of the Affidavit of Discontinuance, which provides in pertinent part that future advertising "will not contain any representations, whether expressly stated or reasonably implied * * * to the effect that: (a) every female user of the 'Mark Eden' device and exercise program is assured some degree of development or enlargement of the female breasts."

The Hearing Examiner had found that a preponderance of the evidence failed to

show a violation of the Affidavit in any of the particulars specified in the Department's motion, and specifically that it failed to show a violation of paragraph 3(a). The district court found that these findings were proper and confirmed them.

The district court did not discuss the findings of the Judicial Officer, but noted that the closing of the investigatory file by the Postal Inspector about April 10, 1967, coupled with the statements and representations of Levine and complete inactivity of the Department until December 12, 1967 would "reasonably cause plaintiff * * * to believe that (it) was in compliance with the plaintiff's affidavit agreement", that the "Department had accepted its actions and advertisements as being in compliance", and that "plaintiff relied upon the actions and more than implied acquiescence of the Department to its detriment."

The court found it unnecessary to reach the question of whether "it can be said that there was no waiver or estoppel binding upon the Department"; but, as noted supra, concluded that the decision of the Department was arbitrary and unjustly penalizes plaintiff-appellee.

Both parties refer at length to language in the Compliance Ad (see note 9) which they claim support their respective positions, i. e., the appellant contending that the advertisement "taken as a whole, contained the implication that every user

14. An "Affidavit of Discontinuance" in a postal fraud proceeding was held valid in United States Bio-Genics Corp. v. Christenberry, S.D.N.Y.1959, 173 F.Supp. 645, aff'd per curiam 2 Cir. 1960, 278 F.2d 561. In this case the Affidavit of Continuance did not contain any provision for a hearing, and the court held that the hearing had been waived and summary disposition through a fraud order was permissible, although the "plaintiff * * * upon a showing of compliance with the affidavit agreement" might have the "fraud order modified or revoked."

15. Nor are we concerned with the truth or falsity of the representations in the various advertisements or the efficacy of the device manufactured by Mark Eden and its Bustline Contour Course. As the Ju-

dicial Officer well said, "It should be thoroughly understood that no statement in this decision is intended, nor should it ever be construed, in any way to be a judgment as to the truth or falsity of any representations—past, current or future, used or to be used by the Respondent in the sale of the device and the program."

16. The Hearing Examiner found Banker's testimony to be "clear, candid, complete, and * * * wholly trustworthy in all significant respects." He indicated that he expected Levine, who was present, to testify if his version of the negotiations differed in any respect from Banker's testimony. The Judicial Officer concluded that giving full credit to Banker's testimony would not "vary the legal effects of the events he related."

would obtain at least 'some degree of development or enlargement' of the bustline," and appellee contending that no such representation could reasonably be implied and that the advertisement does in fact include references to the "likelihood or a possibility of failure."

We find it unnecessary to resolve the question of whether the alleged representations may be implied from the language used in the Compliance Ad. Rather we affirm the judgment of the district court on the ground that under a proper interpretation of the contract the refund order was arbitrary and unwarranted.

### Order for Refund of Impounded Funds

The interpretation of the breach and refund provision of the agreement is primarily a "legal" question, and neither the district court nor this court is bound by the Judicial Officer's construction of the agreement.[17] Moreover, " * * * the United States as a contractor must be treated as other contractors under analogous situations. When problems of the interpretation of its contracts arise the law of contracts govern. * * * We will treat it like any other contractor and not revise the contract which it draws on the ground that a more prudent one might have been made." United States v. Standard Rice Co., Inc., 1944, 323 U.S. 106, 111, 65 S. Ct. 145, 147, 89 L.Ed. 104.

In ordering the distribution of funds the Acting Judicial Officer referred to two provisions of the Affidavit, i. e., the twelfth sentence of Paragraph 5 providing that, "Upon a hearing and determination of the question of breach, the hearing examiner shall order appropriate distribution of the funds so deposited in trust", and Paragraph 2 which reads:

"That neither Respondent nor the undersigned will fill any orders for the Mark Eden device and exercise program which are based on the advertisement agreed herein to be discontinued; that any remittances hereafter received based on such advertisement will be promptly returned to the remitters with a statement to the effect that the advertisement in question has been discontinued, and that orders relating to the discontinued advertisements are no longer being filled; it being understood that remittances which cannot be identified as relating to the discontinued advertisement need not be returned to the senders; "

The Judicial Officer concluded that by reason of the breach "and based on the agreement between the parties in regard to an earlier distribution of funds", an order should be entered for the prompt return to the "remitters with a statement to the effect that the advertising material in question has been discontinued and that orders relating to the discontinued advertisements are no longer being filled."

The record with respect to the agreement of the parties relative to the earlier disposition of impounded funds shows the following:

At the time of the execution of the Affidavit of Discontinuance, the so-called Barbara Hayes Ad had been in use for about 21 months, following the use of the First Ad for two months. Paragraph 2 referred to possible future receipts from the First Ad only. Of $400,000 impounded, approximately $3,000 represented receipts theretofore impounded from the First Ad. Under Paragraph 7, construed with Paragraph 2, this amount was refunded. Mark Eden retained the remaining $397,000, resulting from the Barbara Hayes Ad. The Department did not, however, approve this ad, and the more conservative Compliance Ad was substituted. In other words, all remittances from the Barbara Hayes Ad were

17. This is true "even though the sole record before the court is the administrative record." K E C O Industries, Inc. v. United States, 1966, 364 F.2d 838, 842, 176 Ct.Cl. 983. The interpretation of the language of the Affidavit by the Judicial Officer in providing for refund is not entitled to the same weight as his factual finding that the Compliance Ad was in violation of the contract.

released to Mark Eden despite the Department's view that this advertisement also violated the Affidavit.

In negotiating the settlement resulting in the Affidavit of Discontinuance, Mark Eden had been unwilling to sign an agreement that would permit the issuance of a fraud order without a finding of bad faith or actual intent to deceive. A compromise was proposed by Levine in a letter dated December 7, 1966 confirming a telephone conversation with Banker of the same date. He proposed a revision of the breach clause to include a provision that Mark Eden "shall have the opportunity prior to a hearing scheduled herein, to revise its advertising matter consonant with the objections raised in the charges of alleged breach." The concluding paragraph of the letter reads in part:

"* * * We believe this constitutes a fair and reasonable compromise of our differences in that—(1) your client will have the opportunity to revise its advertising prior to any order based on alleged breach, (2) it will have the right to a hearing on the issue of breach, (3) it will be able to continue its mail order promotion in the name of MARK EDEN, and (4) the future possibility of mail returned marked 'Fraudulent' resulting from a favorable court decision, would be avoided." [18]

The Judicial Officer makes no references to the "cure" provisions in Paragraph 5 of the Affidavit. Following the provisions relating to proceedings preliminary to a hearing, the Agreement expressly provides that Mark Eden "may at any time prior to the hearing revise the advertising matter consonant with charges of the alleged breach." The procedure for submitting revisions includes a provision that the revisions "shall be deemed to have been done upon the giving of notice" to all publications carrying the advertisements, with a copy to the General Counsel of the Post Office Department. The paragraph continues: "The hearing authority * * * shall determine first, whether this Affidavit has been breached in the manner alleged and, second, whether the revisions, if any, of the challenged advertising have cured the alleged breach." After providing for the impounding of the mail, there follows the sentence upon which the Judicial Officer relies—that the "hearing examiner shall order an appropriate distribution of the funds so deposited in trust."

Rules to aid in the construction of contracts as set forth in The Restatement of the Law of Contracts (1932) include the following:

"§ 235 (a) The ordinary meaning of language throughout the country is given to words unless circumstances show that a different meaning is applicable.

(c) A writing is interpreted as a whole and all writings forming part of the same transaction are interpreted together.

(d) All circumstances accompanying the transaction may be taken into consideration, (subject to certain qualifications not here applicable). At p. 319.

"§ 236 (a) An interpretation which gives a reasonable, lawful and effective meaning to all manifestations of intention is preferred to an interpretation which leaves a part of such manifestations unreasonable, unlawful or of no effect.

(d) Where words or other manifestations of intention bear more than one reasonable meaning an interpretation is preferred which operates more strongly against the party from whom they proceed, unless their use by him is prescribed by law." At pp. 327–328.

---

18. We conclude that the contract is ambiguous and that the negotiations leading to its execution may properly be considered. The Judicial Officer in construing other provisions of Paragraph 5 found "ambiguity in the document" and resorted to extrinsic evidence to determine its reasonable import.

**1086** ■

■ Guided by these rules of interpretation and considering the Affidavit in its entirety, and particularly all of the provisions of Paragraph 5 in the light of the negotiations leading to the insertion of the breach-cure-hearing clause, we conclude that the order for refund was not permissible in view of the finding that the breach had been cured by the Revised Compliance Ad.[19] The evidence of the negotiations leading to the Affidavit of Discontinuance as a "compromise" of "conflicting contentions" supports appellee's position that it accepted the "curative" provisions in lieu of a requirement that a "breach" must be in bad faith.

Black's Law Dictionary (Rev. 4th Ed. 1968) at 456 defines "curative" as "Intended to cure (that is, to obviate the ordinary legal effects or consequences of) defects, errors, omissions or irregularities." A curative act is normally retrospective in character.

The requirement that when a breach is found, the hearing authority shall determine "whether the revisions, if any, of the challenged advertising have cured the alleged breach" is consistent with Levine's letter that Mark Eden "would have the opportunity to revise its advertising prior to any order based on the alleged breach." It is clear that the Department did more than find that the Revised Compliance Ad "would not breach the Affidavit." It determined that the revisions "cured the breach" in the Compliance Ad.

Effect must be given also to the provision that the revisions in the advertisements "shall be deemed to have been done upon the giving of notice" to all publications carrying the advertisements. There is no contention that Mark Eden did not act promptly to revise its ad-

vertisement after receiving notice of the alleged breach. This notice was given on March 7, 1968. There is often a two to three months' delay, however, between the placing of an advertisement and its actual publication. In other words, Mark Eden's commitment to the Compliance Ad would inevitably draw remittances for that period after the revisions were sent to the publishers. The impounded funds obviously include substantial amounts received after the notices were sent to the publishers, even though the revisions under the contract were "deemed to have been done."

There is no evidence that Mark Eden did not promptly fill all orders received as the result of the Compliance Ad, due no doubt in part to the fact that the magazines would refuse to publish its advertisement if the orders resulting therefrom were not filled. Nor is there any evidence that Mark Eden did not make a refund to any dissatisfied customer who requested it, pursuant to the money back guarantee in the advertisement.

After the entry of the order providing for refund of all impounded funds derived from sales resulting from the Compliance Ad, Mark Eden sought by its motion for reconsideration to submit evidence of (1) a market survey by a Professor of Business Education at the University of California relating to (a) customer reaction to Mark Eden's advertising, and (b) customer satisfaction with the Mark Eden Developer and program; (2) the affidavit of a "specialist in muscle physiology" relative to the efficacy of the Developer and program; and (3) the findings and decision of a superior court of the State of California in favor of Mark Eden. In an ordinary fraud proceeding this evidence would

19. In the formal Findings of Fact and Conclusions of Law it is recited that, "In the advertising matter shown herein as proposed to be used by Respondent beginning in May and June, 1968, the Respondent will not breach the Affidavit of January 30, 1967, in any manner alleged in Complainant's Motion of December 12, 1967." It is clear from the record that this refers to the Revised Compliance Ad, which had been placed with the publishers on March 7, 1968. Both in his discussion of the facts and his "comments", the Judicial Officer referred to the fact that the revision of the challenged advertising cured the specific breach.

have been admissible on the issue of "intent to deceive." Atlanta Corporation v. Olesen, S.D.Cal.1954, 124 F.Supp. 482, 487.

This evidence was held irrelevant by the Judicial Officer on "the only questions at issue" i. e., (1) whether the advertising met the requirements of the Affidavit, and (2) whether "a fraud order or some lesser penalty should be levied." We agree that it was not relevant to a determination of whether the Compliance Ad met the requirements of the Affidavit. It would have some bearing, however, upon the penalty to be imposed, particularly in view of the fact that Mark Eden had accepted the breach-cure-hearing provisions in lieu of the "bad faith" requirement for a fraud order pursuant to 39 U.S.C. § 4005. This is not a case where the Respondent waived a hearing and consented to summary disposition upon the finding of a breach in the affidavit, as apparently is true with respect to the form of affidavit customarily used by the Department.[20]

The Department might properly order a refund to a customer who had been dissatisfied or misled. Under the Department's construction of the contract, however, the breach-cure provisions would in effect be meaningless. It would permit the Department to avoid the normal requirement for a fraud order that an "intent to deceive" be proven and, upon finding a breach, order a refund of all impounded remittances regardless of (1) any revisions which might have "cured" the breach or (2) when the revisions were made. The Affidavit of Discontinuance, and particularly Paragraph 5, is not a model of clarity, but it is apparent that this was not the intent of the parties.

The refund order of the Department was arbitrary and unwarranted by the Affidavit of Discontinuance. The judgment of the district court accordingly is affirmed.

---

**20.** See reference to United States Bio-Genics Corp. v. Christenberry, n. 14.