## UTAH ᴇᴛ ᴀʟ. *v.* UNITED STATES.*

No. 42. Argued January 19, 20, 1932.—Decided February 15, 1932.

---

* Together with No. 48, *Carbon County Land Co.* v. *United States.*

*Mr. Wm. J. Donovan,* with whom *Mr. George P. Parker,* Attorney General of Utah, was on the brief, for Utah.

*Mr. Mahlon E. Wilson,* with whom *Mr. Frank K. Nebeker* was on the brief, for the Independent Coal & Coke Co.

*Mr. Samuel A. King* for the Carbon County Land Co.

538

*Solicitor General Thacher,* with whom *Assistant Attorney General Richardson,* and *Messrs. Whitney North Seymour* and *Nat M. Lacy* were on the brief, for the United States.

MR. JUSTICE STONE delivered the opinion of the Court.

Certiorari was granted in these cases, 283 U. S. 816, to review a decree of the Circuit Court of Appeals for the Tenth Circuit, by which it reversed a decree of the District Court for Utah and adjudged that the United States was entitled to certain lands described in the bill of complaint and that the petitioners' title to the land is impressed with a trust in favor of the United States.

It specifically decreed the cancellation of a certain mortgage and of tax liens on the lands claimed by the State of Utah, and directed conveyance of the lands and an accounting for their use by the other petitioners. 46 F. (2d) 980.

The sufficiency of the original bill of complaint was upheld and substantially all the questions now presented were considered and determined by this Court in *Independent Coal & Coke Co.* v. *United States,* 274 U. S. 640. The suit was originally brought against the two corporate petitioners and certain individuals, the state not being a party, and the circumstances, so far as they then appeared, were set out in the opinion of this Court as follows (pp. 642–644):

" This is a second suit by the United States, and is in aid of the first, for the restoration to the government of some fifty-five hundred acres of public lands located in Utah, title to which was procured by a fraud perpetrated upon the land officers of the United States. The first suit, which resulted in a judgment for the government (affirmed 228 Fed. 431), was predicated upon the following circumstances.

" The United States, in 1894, made a grant of public lands to the State of Utah to aid in the establishment of an agricultural college, certain schools and asylums and for other purposes. (§§ 8 and 10, Act of July 16, 1894, c. 138, 28 Stat. 107, 109, 110.) Mineral lands were not included. See *Milner* v. *United States,* 228 Fed. 431, 439; *United States* v. *Sweet,* 245 U. S. 563; *Mullan* v. *United States,* 118 U. S. 271, 276; § 2318 R. S. The grant was not of lands in place. Selections were to be made by the state with the approval of the Secretary of the Interior, from unappropriated public lands, in such manner as the legislature should provide. The legislature (Laws, Utah, 1896, c. 80) later created a board of land commissioners with general supervisory powers over the disposition of

the lands and with authority to select particular lands under the grants.

" During the period from December 10, 1900, to September 14, 1903, Milner and others, the predecessors in interest of the Carbon County Land Company, one of the petitioners, made several applications to the State Commission to select and obtain in the name of the state the lands now in question, and at the same time entered into agreements with the Commission to purchase the lands from the state. In aid of the applications and agreements, Milner and his associates filed affidavits with the Commission stating that they were acquainted with the character of these lands which they affirmed were nonmineral and did not contain deposits of coal. They also deposed that the applications were not made for the purpose of fraudulently obtaining mineral holdings, but to acquire the land for agricultural use. The applicants were obviously aware that the affidavits or the information contained in them would in due course be submitted to the Land Office of the United States with the State Commission's selections, as they were in fact. On the faith of these and other documents, the selections were approved by the Secretary of the Interior and the tracts in question were certified to the state on various dates, the last being in December, 1904. Certification was the mode of passing title from the United States to the state.

" In January, 1907, the United States brought the first suit, against Milner and his associates and the Carbon County Land Company, which had been organized by Milner to take over the land, and was controlled by him. The suit was founded on the charge that the certifications were procured by the fraudulent misrepresentations of Milner and the others since they knew at the time of the applications that the lands contained coal deposits. . . . the bill . . . sought the quieting of the government's title. It affirmatively appears that on June 8, 1914, the district

court entered a decree declaring that the United States 'is the owner' and 'entitled to the possession' of the lands in question and that the defendants,' have no right, title or interest, or right of possession,' and perpetually enjoining them 'from setting up or making any claim to or upon said premises.' The Court of Appeals, in affirming the decree, held that 'the whole transaction was a scheme or conspiracy on the part of Milner to fraudulently obtain the ownership of the lands from the United States.'"

In its first opinion, this Court held, for reasons stated and upon authorities cited, that the decree in the earlier suit conclusively established that the Carbon County Land Company was a party to the fraudulent conspiracy to procure certification of the title to the lands to the state; that as against the Land Company and all claiming under it, the United States was equitably entitled to the land; that the Land Company, so far as it had acquired any interest in the land, was not shielded from the consequence of its fraud by having procured a conveyance to the state, even though the latter was not a party to the fraud; and that the Land Company could not acquire any further interest in the property from the state free of the obligation to make restitution of it, which equity imposes on one who despoils another of his property by fraud. *Independent Coal & Coke Co.* v. *United States, supra,* pp. 647, 648.

As the Independent Coal & Coke Company had acquired its alleged interest in the lands subsequently to their certification by the United States, it was held that it took them subject to the equities of the United States unless the defense of bona fide purchaser was affirmatively established, and " that none of the defendants, nor any claiming under them with notice, could by any legal device, however ingenious, acquire title from the state free from the taint of their fraud." *Ibid.,* pp. 646, 647.

After the cause had been remanded to the district court, the two corporate petitioners answered, and the state, which had contented itself with filing a brief *amicus curiae* when the cause was first here, was permitted to intervene. By its bill of complaint in intervention the state set up that at the time of the selection and certification of the lands it " believed and has ever since believed that the land so certified by it was agricultural in character and it did not contain any known mineral;" that in 1920, which was subsequent to the decree in the first suit, it had entered into a new contract with the Land Company, under which it had sold and conveyed the lands to that Company for $100 an acre, or a total of $556,428, taking back a mortgage for that amount, and had since assessed taxes, which were liens upon the lands, aggregating $40,000. The Government, by its answer, prayed the cancellation of the mortgage and tax liens or, in the alternative, if that relief were denied, that the certification of the lands to the state by the United States be cancelled.

After a trial upon evidence, the district court, without making findings, gave judgment cancelling the patent from the state to the Land Company and quieting the state's title. The Court of Appeals, in reversing this decree, made findings, which the evidence supports, that the state, as alleged, had, in 1920, patented the lands to the Carbon County Land Company, taking back a mortgage for the purchase price, and that in the same year the Land Company had sold 1120 acres of the land to the Independent Coal & Coke Company, which had notice of all the proceedings, including the final decree in the first suit.

Upon these findings, it is apparent, from our earlier opinion, that neither of the corporate petitioners can retain any interest in the land, as against the United States. As the Coal Company purchased a part of the lands with notice of the equities of the United States against the Land Company, it took subject to those equities and can

be in no better position with respect to them than its grantor. The Land Company, a party to the fraud by which the certification of the lands to the state was procured, and to the decree in the first suit which so determined, could not improve its position by taking any further conveyance from the state. However innocent the state and its officials may have been in this transaction, any interest the Land Company could acquire from the state in its own behalf was but the fruit of its fraud and of its violation of the decree against it. This aspect of the case was discussed and passed upon in our first opinion, pp. 647, 648, 649, and the conclusion there reached requires affirmance of the decree so far as it affects the Land Company and the Coal Company.

The State of Utah can stand in no better situation with respect to the mortgage and tax liens which it asserts. A copy of the bill of complaint in the original suit was handed to the State Board of Land Commissioners when the suit was begun in 1907 and the state has been fully advised of all the subsequent proceedings. By 1904, it had contracted to sell the lands to Milner and associates for $1.50 an acre, payable in installments of 25 cents a year. By virtue of these contracts, the vendees were equitably entitled to the land, and the state's interest was but that of a vendor, having the mere right to retain the title as security for any unpaid balance of the agreed purchase price. See *Williams* v. *United States,* 138 U. S. 514, 516; *Boone* v. *Chiles,* 10 Pet. 177, 224. It was the equitable ownership in the lands thus acquired by Milner and associates and conveyed by them to the Land Company, which the decree in the first suit, in 1914, adjudged to be in the United States.

The Government's allegation in its answer to the intervention complaint of the state, that at the time of the decree the purchase price had been paid in full, was not denied by the state's replication. No evidence on the

point was offered, but in the present circumstances we do not think it material. Subject to the state's security title and right as vendor, every interest in the land was vested in the Land Company, whose rights remained unchallenged and unaffected by any action of the state when the decree was entered in the first suit. That decree irrevocably fastened the equities of the United States upon every right and interest which the Land Company had or could procure in the land. So far as the state was concerned, the decree substituted the United States in the place and stead of the Land Company as equitable owner of the land and stripped the latter of power to surrender its interest to the state. The decree [1] was likewise of binding force upon everyone, including the state, who might later knowingly attempt to acquire any new or different interest in the land in derogation of the equities adjudged to be in the United States. Even if we were to assume that at the time of the decree there was an unpaid balance of purchase money (which could not have exceeded $1.50 an acre), the state was entitled only to retain its title until payment was made. Beyond this it could make no profit and derive no benefit free of the equitable rights of the United States. Any grant of the lands by the state to the Land Company or to a stranger,

---

[1] The decree provided " That the plaintiff [the United States] is the owner and entitled to possession of the following described property, to-wit: . . . and that plaintiff's title thereto be quieted against any and all claims of the defendants, or either of them or of any person or persons claiming, or hereafter to claim through or under the said defendants, or any or either of them; that said defendants, and each of them, have no right, title or interest, or right of possession in or to said premises hereinabove described, or to any part thereof; and the said defendants, and each of them, are perpetually restrained and enjoined from setting up or making any claim to or upon said premises, or any part thereof, and all claims of said defendants, and each of them, are hereby quieted."

without the assent of the United States, would have been in violation of its equitable rights as they had been adjudicated by the decree. See *Gorham* v. *Farson,* 119 Ill. 425; 10 N. E. 1; *Houghwout* v. *Murphy,* 22 N. J. Eq. 531, 546–547; *Taylor* v. *Kelly,* 56 N. C. 240.

Ignoring those rights, the state issued a patent to the Land Company, receiving as the proceeds of its wrongful conveyance, the mortgage of the Land Company, an active participant in the fraudulent scheme, to secure the increased payments of $100 an acre. It actively facilitated the conveyance to the Coal Company by the Land Company, by agreeing with both that the state would release from the mortgage the lands conveyed to the Coal Company upon payment of $112,000, which the Coal Company undertook to pay. This attempted enlargement of the state's interest in the lands, in diminution of the equities of the United States, like the conveyance, mortgage, and agreement by which the attempt was made, was a violation of the decree and of the equitable rights confirmed by it, from which the state can take no benefit. This is not any the less the case because the Land Company, as against the United States, could not rightly receive the patent or retain its benefits or grant to any other than the United States any interest in the patented lands.

The state urges that the United States is estopped to assert any claim to the lands as against it by statements made by a Special Assistant Attorney General in a conversation between him and members of the Board of Land Commissioners in 1907, when he delivered to them a copy of the bill of complaint in the first suit. We agree with the court below that his statements cannot be regarded as so inconsistent with the bill as to form any basis for the alleged estoppel. In any case, he was obviously without authority to dispose of the rights of the

United States in its mineral lands and could not estop it from asserting rights which he could not surrender. *Utah Power & Light Co.* v. *United States,* 243 U. S. 389, 408, 409; see also *San Pedro and Cañon del Agua Co.* v. *United States,* 146 U. S. 120, 131 *et seq.*

It is also argued that the lands were not mineral lands, and that the adjudication to that effect in the first suit is not *res adjudicata* as to the state. That question was again litigated in the present suit, and upon this issue the court below, upon sufficient evidence, found in favor of the United States. See *Diamond Coal & Coke Co.* v. *United States,* 233 U. S. 236. But we do not think that question requires our examination or is open upon the present record. The decree in the first suit adjudicated the equitable rights of the United States as against the corporate petitioners. For reasons already stated, the state has at no time had or asserted any interest superior to that of the United States, except its vendor's title, which it has since relinquished to the Land Company.

In our first opinion we held that the six year statute of limitation of actions to cancel patents granted by the United States, even if embracing a suit brought for cancellation of a certification of lands by the United States, had no application to the relief sought against the corporate petitioners. For the same reason it can have none to the relief granted against the state in accordance with the prayer of the bill. The present suit did not seek cancellation of the certification unless that prayer was denied. It asserts equitable rights to interests in the land derived under and by virtue of the certification. The decree proceeds, and is affirmed here, on the ground that the mortgage and tax liens asserted by the state are subordinate to those rights.

We have considered, but find it unnecessary to discuss, other objections to the decree.

*Affirmed.*