**INSTITUTE FOR WEIGHT CONTROL, INC., Plaintiff,**

v.

**Elmer T. KLASSEN, Postmaster General, United States Postal Service and Joseph C. Thomas, Postmaster, Englewood, New Jersey, Defendants.**

Civ. A. No. 1384–72.

United States District Court, D. New Jersey.

Oct. 6, 1972.

Herbert Alterman, Passaic, N. J., Bass & Ullman, by Sheldon S. Lustigman, New York City, Fensterwald & Ohlhausen, by William G. Ohlhausen, Washington, D. C., for plaintiff.

Herbert J. Stern, U. S. Atty. by Marc L. Dembling, Asst. U. S. Atty., Newark, N. J. (James J. Robertson, Staff Atty., Consumer Protection Office, Law Dept., United States Postal Service, Washington, D. C., of counsel) for defendants.

**1306**

## OPINION

LACEY, District Judge.

This matter comes on by way of cross motions for summary judgment.*

Plaintiff seeks injunctive relief against enforcement of what it alleges is an illegal mail stop order, issued by defendants under 39 U.S.C. § 3005, after an administrative determination of false advertising. This Court has jurisdiction under 39 U.S.C. § 409.[1]

## PREVIOUS PROCEEDINGS

Defendants (hereinafter sometimes referred to collectively as "Postal Service") initiated administrative proceedings against the plaintiff by filing a Postal Service complaint on May 17, 1972, charging a violation of 39 U.S.C. § 3005 by magazine advertisements allegedly constituting a scheme for obtaining money through the mails by means of false representations.[2]

---

* References will be made throughout to pages of the administrative transcript of testimony.

1. The complaint alleges jurisdiction under 5 U.S.C. § 1009(c). That statute was not in effect at the time of filing of the complaint, nor now.

The Postal Service may "sue and be sued in its official name". 39 U.S.C. § 401(1). 39 U.S.C. § 409 provides:

Suits by and against the Postal Service

(a) Except as provided in section 3628 of this title, the United States district courts shall have original but not exclusive jurisdiction over all actions brought by or against the Postal Service. Any action brought in a State court to which the Postal Service is a party may be removed to the appropriate United States district court under the provisions of chapter 89 of title 28.

(b) Unless otherwise provided in this title, the provisions of title 28 relating to service of process, venue, and limitations of time for bringing action in suits in which the United States, its officers, or employees are parties, and the rules of procedure adopted under title 28 for suits in which the United States, its officers, or employees are parties, shall apply in like manner to suits in which the Postal Service, its officers, or employees are parties.

(c) The provisions of chapter 171 and all other provisions of title 28 relating to tort claims shall apply to tort claims arising out of activities of the Postal Service.

(d) The Department of Justice shall furnish, under section 411 of this title, the Postal Service such legal representation as it may require, but with the prior consent of the Attorney General the Postal Service may employ attorneys by contract or otherwise to conduct litigation brought by or against the Postal Service or its officers or employees in matters affecting the Postal Service.

That judicial review of this administrative determination may be had by way of suit for an injunction is clear. 5 U.S.C. § 703. *See also* Rettinger v. F.T.C., 392 F.2d 454 (2d Cir. 1968).

2. 39 U.S.C. § 3005 provides:

False representations; lotteries

(a) Upon evidence satisfactory to the Postal Service that any person is engaged in conducting a scheme or device for obtaining money or property through the mail by means of false representations, or is engaged in conducting a lottery, gift enterprise, or scheme for the distribution of money or of real or personal property, by lottery, chance, or drawing of any kind, the Postal Service may issue an order which—

(1) directs the postmaster of the post office at which mail arrives, addressed to such a person or to his representative, to return such mail to the sender appropriately marked as in violation of this section, if the person, or his representative, is first notified and given reasonable opportunity to be present at the receiving post office to survey the mail before the postmaster returns the mail to the sender; and

(2) forbids the payment by a postmaster to the person or his representative of any money order or postal note drawn to the order of either and provides for the return to the remitter of the sum named in the money order or postal note.

(b) The public advertisement by a person engaged in activities covered by subsection (a) of this section, that remittances may be made by mail to a person named in the advertisement, is prima facie evidence that the latter is the agent or representative of the advertiser for the receipt of remittances on behalf of the advertiser. The Postal Service may ascertain the existence of the agency in any other legal way satisfactory to it.

Concurrent with the filing of the administrative action, the Postal Service caused the Justice Department to institute proceedings in this Court against the plaintiff in accordance with 39 U.S.C. § 3007.[3] A temporary restraining order (on May 25, 1972), and thereafter a preliminary injunction (on May 31, 1972), issued, directing the Postal Service to detain the plaintiff's incoming mail during the pendency of the aforesaid administrative hearing and any appeal therefrom. *See* United States Postal Service v. Jay Kaplan, d/b/a Institute for Weight Control, District of New Jersey, Civil Action No. 899–72. The injunction was founded upon a finding by this Court that there was the requisite "probable cause" to believe that the plaintiff's advertising violated 39 U.S.C. § 3005.[4]

The answer of the plaintiff in the administrative proceeding was filed on June 7, 1972. It denied that the representations charged were made by the plaintiff and also denied that the representations made in its advertising material were materially false.

The administrative hearing took place in Washington, D. C. on June 13, and 14, 1972, before Judicial Officer Adam G. Wenchel, whose decision was that plaintiff was soliciting money through the United States mail through false representations, in violation of 39 U.S.C. § 3005. However, the effective date of the administrative order was voluntarily deferred by the Postal Service when plaintiff commenced the instant proceeding for judicial review.

Plaintiff's complaint herein was originally filed in the United States District

---

(c) As used in this section and section 3006 of this title, the term "representative" includes an agent or representative acting as an individual or as a firm, bank, corporation, or association of any kind.

This relatively new statute is part of the Postal Reorganization Act, Pub.L. 91–375, § 2, August 12, 1970, 84 Stat. 719, which, among other things, created the United States Postal Service to which all the functions, powers, and duties of the Post Office Department and the Postmaster General of the Post Office Department were assigned, and abolished the Post Office Department and the office of the Postmaster General. Sec. 3005 is the "fraudulent advertising" replacement for 39 U.S.C. § 4005, and, accordingly, I have relied in this opinion to a degree on case law construing § 4005.

3. 39 U.S.C. § 3007 provides:
Detention of mail for temporary periods
(a) In preparation for or during the pendency of proceedings under sections 3005 and 3006 of this title, the United States district court in the district in which the defendant receives his mail shall, upon application therefor by the Postal Service and upon a showing of probable cause to believe either section is being violated, enter a temporary restraining order and preliminary injunction pursuant to rule 65 of the Federal Rules of Civil Procedure directing the detention of the defendant's incoming mail by the postmaster pend-

ing the conclusion of the statutory proceedings and any appeal therefrom. The district court may provide in the order that the detained mail be open to examination by the defendant and such mail be delivered as is clearly not connected with the alleged unlawful activity. An action taken by a court hereunder does not affect or determine any fact at issue in the statutory proceedings.
(b) This section does not apply to mail addressed to publishers of newspapers and other periodical publications entitled to a periodical publication rate or to mail addressed to the agents of those publishers.

4. The transcript of the earlier hearing before this Court, held May 25, 1972, is included within the administrative record, though not marked as an exhibit therein, and not referred to by the Judicial Officer, at least insofar as the record of the administrative hearing is concerned. I have not considered it in arriving at my determination herein.

The power to grant an injunction under this statute has since been sustained in United States Postal Service v. Beamish, d/b/a Natural Products, 466 F.2d 804 (3d Cir. 1972); "probable cause" is sufficient, and irreparable injury need not be demonstrated. As Chief Judge Seitz pointed out in *Beamish* "[t]he legislative history of the section is silent as to its intended interpretation."

Court for the District of Columbia. On the application of the Postal Service the matter was transferred to this district. In the meantime, plaintiff had moved for summary judgment. Defendant, without objection by plaintiff, having similarly moved orally before this Court, I treat the matter as being before me on cross motions for summary judgment. F.R. Civ.P. 56.

The parties have submitted extensive briefs, and oral argument was held herein on September 11, 1972, and September 15, 1972.

## SCOPE OF REVIEW

My review of the decision of the Judicial Officer is limited to determining whether there is, considering the record as a whole, substantial evidence to support his findings of fact, and whether he has committed errors of law. *See* 5 U.S.C. § 706(2)(A); Consolo v. Federal Maritime Commission, 383 U.S. 607, 618–621, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1965); NLRB v. Brown, 380 U.S. 278, 291–292, 85 S.Ct. 980, 13 L.Ed.2d 839 (1964); Universal Camera Corp. v. NLRB, 340 U.S. 474, 497, 71 S.Ct. 456, 95 L.Ed. 456 (1954); Mark Eden v. Lee, 433 F.2d 1077, 1083 (9th Cir. 1970); 4 Davis, Administrative Law Treatise (1958), § 29.01, 114. *Cf.* Stein's v. Pilling, 256 F.Supp. 238 (D.N.J.1966), aff'd. 379 F.2d 554 (3d Cir. 1967); Pinkus v. Reilly, 71 F.Supp. 993 (D.N.J.1947), aff'd. 170 F.2d 786 (3d Cir. 1948), aff'd. 338 U.S. 269, 70 S.Ct. 110, 94 L.Ed. 63 (1949).

## THE ADMINISTRATIVE RECORD

The advertisement at issue reads as follows:

LOSE 10 POUNDS IN 2 WEEKS OR YOUR MONEY BACK. Skini-minis are completely safe, contain no amphetamines or habit forming drugs. The answer is quite simple. The timed released ingredient helps fill your stomach, helps keep you from over eating and helps you shed those unwanted pounds.

Skini-minis also contain 100% of the adult daily requirement of iron and Vitamins B1, B2 and C, since many people watching their weight don't always get their vitamins.

Take one Skini-mini daily. If you haven't lost at least 10 pounds at the end of a 2-week period let us know and we'll return your money no questions asked.

The Postal Service administrative complaint charged that this advertisement violated 39 U.S.C. § 3005 in that the plaintiff herein by "materially false" representations, represented:

1. That the purchaser of Skini-Minis can, through their daily use, lose ten pounds in two weeks;

2. That Skini-Minis ingredients produce sufficient bulk in the stomach to give its users a full feeling and thereby allows its users to avoid excessive caloric intake which will have some substantial effect on desired weight loss;

3. That Skini-Minis are an effective aid to appetite control; and

4. That Skini-Minis will have a substantial and material contribution to a weight loss of at least ten pounds in two weeks without the necessity of adhering to a dietary regimen.

In his Findings of Fact the Judicial Officer found that representations 1, 3 and 4 were in fact made in the advertisement. As to representation 2, he stated: "While I believe that representation 2 is substantially made, I do not make a finding with respect to it." [Postal Service Decision at p. 9] Counsel on oral argument, and this Court, are in agreement that by this the Judicial Officer meant that he did not find that representation 2 was in fact made by the advertisement involved.

As thus limited, under his Conclusion of Law, the Judicial Officer found that the plaintiff herein "is engaged in conducting a scheme or device for obtaining money or property through the mail by means of false representations within the meaning of 39 U.S.Code 3005." As is

clear from both the briefs filed on this motion and oral argument, counsel interpret this determination as being applicable to all three of the charged representations (1, 3 and 4).

There is abundant support for the administrative finding that representations 1, 3 and 4 were made, as charged by defendants. Given a fair, reasonable and pedestrian construction, and read in its totality, Donaldson v. Read Magazine, 333 U.S. 178, 189, 68 S.Ct. 591, 92 L.Ed. 628 (1948), Stein's v. Pilling, *supra*, 256 F.Supp. at 243, the advertising matter obviously represents that through daily use of Skini-Minis one can "lose ten pounds in two weeks"; that the product is "an effective aid to appetite control"; and that the product "will have a substantial and material contribution to a weight loss of at least 10 pounds in 2 weeks without the necessity of adhering to a dietary regimen." Indeed, on this proceeding, plaintiff has not seriously argued against this portion of the administrative determination. I find substantial evidence to support the Judicial Officer's findings in this regard.

I turn now to the more seriously disputed administrative determinations, that the aforesaid representations were false, and to the subissue of the efficacy of the advertised product.

Of the ingredients of the product Skini-Mini, the only two related to the advertising claims, and with which we need be concerned, are benzocaine and sodium carboxymethylcellulose (SCMC). The former is claimed to alleviate hunger pains in the stomach; the latter is said to cause hunger-sensation reduction by creating a feeling of stomach fullness. There was sharp disagreement among the medical experts called by the respective parties over the effectiveness of the two ingredients, particularly in the quantities involved in the product when used as recommended.

One of the cornerstones of the Judicial Officer's opinion is as follows:

Considering the evidence as a whole, I find that benzocaine in the quantity here involved would not appreciably affect the users' appetite or hunger. . . . [Postal Service Decision at p. 8].

I find substantial evidence to support the administrative determination that "benzocaine in the quantity here involved would not appreciably affect the user's appetite or hunger."

Dr. Cardaro, associated with the Food and Drug Administration, testified for the Postal Service that benzocaine did not "have a medically recognized use as an anesthetic for the stomach," and that benzocaine, being insoluble in water, and therefore safe for topical application on the skin and some mucuous membranes, would because of its insolubility in water not be available as an anesthetic in the stomach if taken with water.

To support its claim of benzocaine's efficacy in dealing with hunger, plaintiff relied principally on its counsel's cross examination of Dr. Cardaro. However, the Judicial Officer, being in a better position to judge demeanor and other subjective indications of credibility, obviously concluded that Dr. Cardaro's credibility remained substantially unaffected by cross examination. I cannot override this determination on the record presented. *See* NLRB v. Scoler's Inc., 466 F.2d 1289 (2d Cir. 1972); Universal Camera Corp. v. NLRB, 340 U.S. 474, 496, 71 S.Ct. 456, 95 L.Ed. 456 (1951); Mak-All Manufacturing Inc. v. NLRB, 331 F.2d 404, 405 (2d Cir. 1964).

Plaintiff's only other proffer on the issue of benzocaine's effectiveness came in the form of brief testimony from plaintiff's expert, Dr. Tesler, who stated (174):

. . . Here, in a capsule such as this which is swallowed; it would directly reach the stomach, and the effect on the gastric mucosa of a topical anesthetic would be basically to a (sic) decrease gastric acid secretion which would likewise tend to decrease hypermotility or hyperperistalsis, of the stomach, (sic) is increased the activity of the stomach, and secondarily, it could have an effect on so-called hung-

er pains, and again, tend to decrease appetite.

Given the testimony of Dr. Cardaro, supported and supplemented by the other medical expert called by the Postal Service, Dr. Crowell, as weighed against the plaintiff's evidence, and in the light of the entire record, there is clearly a basis in substantial evidence for the Judicial Officer's finding on benzocaine.

It was with respect to the efficacy of the other principal ingredient of Skini-Minis, SCMC, that plaintiff made its vigorous stand. Again, however, I find substantial evidence in the record as a whole to support the determination of "false representations" by the Judicial Officer, and his finding on the subissue of efficacy, that SCMC in the prescribed dosage quantity would be ineffective. Dr. Crowell testified on the Postal Service's direct case that plaintiff's product is inefficacious. Licensed in several jurisdictions, he specializes in internal medicine. In about 1955 he established an obesity clinic at George Washington Hospital and maintained this clinic until 1969. His practice over that period of time has dealt to a substantial degree with the treatment of obesity, including development of reducing programs for patients. At the clinic studies were run on the efficacy of certain drugs in the treatment of obesity, although, like Dr. Tesler, plaintiff's expert, Dr. Crowell has never conducted or participated in a study of the principal ingredients of Skini-Minis.

Dr. Crowell testified (as did the other experts) that weight is lost only by restricting caloric intake or increasing physical activities so as to burn more calories than one's particular intake happens to be (15–17); that SCMC had a medically recognized use as a laxative (52) but not for treatment for obesity; that the ingestion of that product "in the dosages indicated on this label" would have no effect on appetite (22); and that singly, or collectively, taking of any, or all, of the ingredients in Skini-Minis in the dosages indicated would have only a minimal effect, or no effect, on hunger (24), and would be of no influence on a person's ability to lose weight (34).

The greater portion of plaintiff's cross examination of Dr. Crowell was designed to attack the Doctor's qualifications and credibility. To the extent that an administrative determination on credibility can and should be reviewed in the light of *Scoler's, Universal Camera,* and *Mak-All, supra,* there is sufficient evidence in the record to enable this Court to say that the Judicial Officer would have been justified in crediting Dr. Crowell's foregoing testimony as worthy of acceptance in view of his experience in treating obesity and the overall record, read in its entirety.

Plaintiff argues that the Judicial Officer should have not only rejected Dr. Crowell's testimony on the inefficacy of SCMC, but should have accepted Dr. Tesler's as to its efficacy.

Dr. Tesler repeatedly linked any weight loss from the use of Skini-Minis with the requisite accompanying use of the plaintiff's diet plan, which, as we have noted, is not mentioned in the questioned advertising. Only at one point in his testimony did he treat the product itself separately, as follows (177–178):

Q. Now, Doctor, if a person just took the product without that specific plan that we have given here on that chart, could a person lose weight just by taking the product?

A. It's *conceivable,* because if the patient took the product, the results of the ingestion of the product as such, he may very well cut down without being consciously aware of it on his caloric intake. By the very nature of the product, it tends to fill the stomach, cause the expansion of the stomach, cut down on the appetite. While he may not be counting calories and keeping a chart and being aware of it, there's a good chance that he would lose weight with that alone. [emphasis supplied]

One of the issues necessarily to be resolved, as determined by the Judicial Officer, was whether, assuming the basic utility of SCMC, there was sufficient SCMC in a Skini-Mini pill to curb the appetite so as to justify the advertising claims. Dr. Tesler's testimony on this critical issue was vague, uncertain, and equivocal. The quantity of SCMC necessary to distend the stomach sufficiently to curb hunger, he said, varied from individual to individual and he was unable to say how much 134 milligrams of SCMC (the amount in one Skini-Mini pill, the recommended daily dosage) would swell to when exposed to water, and having absorbed it (201–206). He was also vague and uncertain as to what the time release ingredients were in Skini-Minis, and what their effect would be on the SCMC therein (212–213).

That the matter of weight loss was, as Dr. Crowell had said, absolutely linked to diet and calorie intake was agreed to by Dr. Tesler, when he stated that if one rigidly adhered to "this diet," the ingestion of Skini-Minis would not cause loss of more weight than that person "was already going to lose" as a result of adhering to the diet (221).

Overall, weighing Dr. Tesler's testimony, and balancing it against Dr. Crowell's, I determine that the administrative decision was based upon substantial evidence.

Moreover, Dr. Crowell's testimony was not uncorroborated. On rebuttal, the Postal Service called Dr. Cardaro, who serves presently within the Food and Drug Administration as a reviewing medical officer, which involves reviewing submissions for drugs and chemicals, and, evaluating them for safety, efficacy and labelling (375). He is very familiar with SCMC (379).

After discussing the time release formula in an ingredient (380), he pointed out that the total amount of SCMC contained in a Skini-Mini pill would necessarily disintegrate over an entire day covering 3 meals. On the other hand, he also pointed out that "no one knows how this was formulated, as to the timing of the release of the ingredients. The information is not available on the label." (381).

Based on the indicated dosage of 1 pill a day, the SCMC, he stated, would be passed out with the first meal that was ingested after taking the pill. "It would be removed with the food, and passed into the smaller bowel." (382). He pointed out that 1 gram of SCMC would absorb 8 grams of water. Thus, 134 milligrams of SCMC would absorb 8 milligrams of water which "would be less than a gram of water so that the total after absorption of the SCMC, if it absorbed it all at one time, would be less than a gram of volume or bollest, which would be ⅒th of an ounce." He stated that this bollest would be the size of a "hazel nut" (386–387), and since the capacity of the average stomach is roughly one quart, SCMC in the dosages indicated on the Skini-Mini label would not be effective as an appetite or hunger depressant (397).

On the basis of the foregoing testimony, what then can be said about the findings of the Judicial Officer? He had stated:

. . . Sodium carboxymethylcellulose in sufficient quantities could cause a loss to appetite or hunger to some degree but this is not determinative of whether the representations made in Respondent's advertising are true or false. [Postal Service Decision at p. 8].

This would seem to be the most favorable view that could be taken of the evidence that has already been set forth insofar as the plaintiff is concerned and of course it is completely sound in its conclusion that "this is not determinative of whether the representations made in Respondent's advertising are true or false."

The Judicial Officer's opinion then follows:

The only evidence before me as to the extent to which the stomach would be filled by a Skini-Mini tablet is that in the testimony of Dr. Cardaro who

estimates the size of the mass produced by the amount of the sodium carboxymethylcellulose contained in a Skini-Mini to be approximately that of a walnut. Since the stomach capacity is approximately one quart the degree of filling indicated would not be substantial. [Postal Service Decision at p. 8].

This too would be stating it even more favorably than the plaintiff was entitled to on the basis of the record. As has been noted above, Dr. Cardaro testified that SCMC, in the label dosage, would have no effect as a hunger or appetite depressant (397).

After then turning to the representations which the Postal Service claims were made in the advertising, and were false, and, as has been indicated, indicating that he was not going to make a finding that representation 3 was in fact made in the advertisement, the Judicial Officer then reviewed the advertisement itself. His review is a fair and accurate one. He notes of course that the advertisement does not contain any reference to a dietary regimen although " . . . it does refer to helping you from overeating." [Postal Service decision at p. 9].

His findings also state that:

It is clear from the testimony of all the medical witnesses that aside from increasing the need for calories through such means as exercise, the only manner in which weight can be effectively lost is through reduction of caloric intake. [Postal Service Decision at p. 10].

Certainly this is supported completely by and is undisputed in the record.

The Judicial Officer then continued:

The purchaser of Skini-Minis also gets with the product diet plans which are in evidence as Complainant's Exhibit 4. It appears clear that substantial weight loss can be effected if people adhere to the diet plan. However, the advertisement involved here does not suggest adherence to a diet plan either the one furnished or any other, but indicates that with the use of Skini-Minis the natural desire for food will reduce sufficiently to effect the loss of ten pounds of weight in two weeks. [Postal Service Decision at p. 10].

Certainly the thrust of the advertising is exactly as the Judicial Officer indicates, namely that the product, if used, will result in "the natural desire for food [being] . . . reduce[d] sufficiently to effect the loss of ten pounds of weight in two weeks." See Donaldson v. Read, supra.

Given the testimony of Dr. Crowell and Dr. Cardaro, I find substantial evidence to support the Judicial Officer's determination that representations 1, 3 and 4 are false. As to representation 1, [t]hat the purchaser of Skini-Minis can, through their daily use, lose ten pounds in two weeks," neither of these physicians saw any impact at all on hunger or appetite which would somehow lead to a diminution in consumption of food and calories so as to cause the loss of ten pounds in two weeks and, of course, all the physicians agreed that it is only through loss of or reduction in intake of calories that weight can be lost at all.

As to representation 3, it provides "[t]hat Skini-Minis are an effective aid to appetite control"; again, given the testimony of Dr. Crowell and Dr. Cardaro, undiminished as it was in probative force by Dr. Tesler's testimony, it is clear that there is substantial evidence in the record to justify the finding that this representation is false.

Representation 4 provides "that Skini-Minis will have a substantial and material contribution to a weight loss of at least ten pounds in two weeks without the necessity of adhering to a dietary regimen." On the basis of the record, there is substantial evidence to support the finding of falsity as to representation 4. Indeed, even the testimony of Dr. Tesler, considered by itself, would support such a finding.

Accordingly, the administrative determination is, in all respects affirmed.

## THE ESTOPPEL DEFENSE

Plaintiff's answer in the administrative proceeding raised the affirmative defense of estoppel, based upon its submission to the general counsel of the Postal Service of the herein challenged advertising material upon disposition of a prior fraud proceeding in that agency. It now reasserts estoppel, or a form thereof, as a reason why its motion should be granted.

A review of the prior proceeding indicates that it was instituted against the plaintiff by a Postal Service complaint, dated May 26, 1971, charging that the plaintiff (under its former corporate name Barbizon Weight Control Systems, Inc.), through false advertising of "Skini-Mini Capsules," had violated 39 U.S.C. § 4005 (the predecessor of 39 U.S.C. § 3005). This proceeding resulted in the execution of a Compromise Agreement on June 15, 1971, which among other things stated as follows:

. . . 1. The use of the aforementioned promotional activities and representations for obtaining money or property through the mails has been and will be permanently discontinued and abandoned, and will not hereafter be resumed, directly or indirectly, under any name or names, or through any corporate or other device.

\* \* \* \* \* \*

4. This agreement relates exclusively to the matter involved herein and the execution hereof shall not constitute a defense or release of the undersigned of any responsibility for violation of any other statute. . . .

5. No officer, employee, or agent of the Post Office Department has expressly or impliedly, directly or indirectly, accepted or approved any revised advertising matter or activities presently employed or contemplated for future use by the undersigned.

Directly below paragraph 5 was the date of the agreement, June 15, 1971, and the words "Agreement effective: August 15, 1971." There then appears directly below this the signature of Jay A. Kaplan as President of Barbizon Weight Control Systems, Inc. Apparently the signing of the agreement was accomplished at a conference attended by Messrs. Kaplan and Zerler on behalf of the plaintiff and Messrs. Ziebarth and Hefner on behalf of the Postal Service.

Plaintiff's STATEMENT OF THE CASE, submitted in its Brief to this Court on this matter, states (p. 2):

. . . Plaintiff's former vice president testified [at the June, 1971 Postal Service hearing] that at a meeting with counsel for the Postal Service at the time the Compromise Agreement was entered into, the aforesaid counsel [Mr. Ziebarth] suggested that future advertising would not be objectionable if the advertising copy were changed in the following substantive way:

A. Skini-Minis make your stomach feel full

> to

Skini-Minis help make your stomach feel full

B. Benzocaine dulls your appetite

> to

Benzocaine helps dull your appetite

C. Keeps you from over-eating

> to

Helps keep you from over-eating

Plaintiff cites the transcript of the administrative hearing, at pages 315–317, to support these averments. The record indicates that Mr. Zerler and Mr. Hefner testified at the hearing but that Mr. Kaplan, plaintiff's president, and Mr. Ziebarth, did not; and that Mr. Zerler, while endowed with the title of vice-president, was simply a consultant and was not a part of plaintiff's corporate organization. With respect to the June 15, 1971 meeting, the following testimony of Mr. Zerler is in point (313–314):

Q. Now, did Mr. Ziebarth advise you that he was not in a position to approve proposed advertisements?

A. Yes . . . \* \* \*

Q. Well—I take it that either you or Mr. Kaplan read this compromise agreement, is that correct?

A. Yes, sir.

Q. It wasn't you?

A. No, sir . . . * * *

Q. You've indicated that Mr. Ziebarth approved the proposed revisions in Barbizon's ads, is that correct?

A. I can't say that he approved it . . . they told us, they said we can't tell you what to but we can tell you what you've done wrong and what not to do. ¶ In other words, it was a general discussion. . . .

*See also*, 283, for further testimony of Mr. Zerler on this subject.

Mr. Zerler added (315):

Then Mr. Kaplan, I believe said suppose we amended it a little and we say 'helps' do this thing, 'helps' do that thing, how would that be?

And they said that might help the situation, I don't exactly remember the words the conversation per se. The general sum and substance of it was if we wanted to continue in business, which was what our intention was for coming down there, we would have to have the advertising be acceptable to the Postal authorities. That was our purpose for being there.

It is apparent from the Zerler testimony that the alleged discussion, if it occurred, had to take place prior to the signing of the Compromise Agreement which, as has been noted, in paragraph 5 expressly and impliedly negatives, "directly or indirectly," acceptance by any Postal Service employee for approval of "any revised advertising matter or activities presently employed or contemplated for future use by the undersigned."

Thus, the contention in plaintiff's Statement of the Case, is unsupported in the record. Moreover, with respect to any alleged "approval," or "suggestion,"

of any advertising revisions which would be acceptable, Mr. Zerler could not remember whether it was Mr. Ziebarth or Mr. Hefner on whom he relied for that statement.

Mr. Hefner, responding to the Zerler testimony (466–467), testified that he did not hear Mr. Ziebarth require any specific change in the advertisement, and that no approval was ever given by the Postal Service to any advertisement intended to be, or utilized by Barbizon or Institute for Weight Control. This testimony is of course consistent with the language of paragraph 5 of the Compromise Agreement. Plaintiff acknowledges that the Compromise Agreement itself specifies that the Post Office Department has not expressly or impliedly approved any revised advertising matter, and concedes it did not receive "formal approval" for its revised advertising (that is, the advertising in suit).

As noted by the Judicial Officer in his opinion:

There is a conflict in the testimony as to whether any agreement was reached by implication as to future advertising during the course of the meeting between representatives of *Barbizon* and the Consumer Protection Office on June 15, 1971, in connection with the execution of the compromise agreement. [Postal Service Decision at pp. 5–6].

The record supports that there was such a "conflict in the testimony," and, given this conflict, the concession by plaintiff that there was never Postal Service approval, and the disclaimer statement made in the agreement itself, there is substantial evidence for the conclusion that it would be unreasonable to believe "that the Post Office Department attorneys would have accepted as compliance with the compromise agreement, advertising which was substantially similar to the advertising which formed the basis of the complaint and the *Barbizon* case.[5] Likewise would it have been unreasonable for plaintiff so to conclude.

---

5. See Postal Service Decision at p. 6.

Crucial to plaintiff's claim of estoppel is whether plaintiff was led to believe on June 15, 1971 that its new advertising was approved by the Postal Service. I determine that the Judicial Officer's determination on this point is supported by substantial evidence.

██ Subsequent to June 15, 1971 it appears that in or about September, 1971 the Postal Service filed a Petition for a mail stop order based upon an alleged breach of the aforesaid Compromise Agreement on the ground that certain monies had been accepted by plaintiff on the basis of the prior false advertisement. In support of the Petition there were attached a copy of the June 15, 1971 Compromise Agreement, an affidavit of a postal inspector stating that he had caused 3 test purchases of Skini-Minis capsules to be made, and copies of certain other documents. Thereafter on October 1, 1971 plaintiff herein, by Mr. Zerler, advised the Consumer Protection Office of the Postal Service that the illegally filled orders had been filled through inadvertence and that its new advertising, enclosed with the letter, was in full compliance with the Agreement. Enclosed with this letter were copies of 3 advertisements, one using the name Barbizon Weight Control Systems, Inc., a second one using Barbizon Health Control Systems, Inc., and a third Barbizon Systems. As is noted by the Judicial Officer in his opinion, "[a]lthough the Ad using the name Barbizon Health Control Systems, Inc., does contain the statement 'Take 1 Skini-Mini daily and follow Barbizon's calorie control plan,' this reference to the calorie control plan does not appear in the same manner in the other two advertisements." [Postal Service Decision at p. 4].

As is further noted by the Judicial Officer in the instant case:

After receipt of that letter [of October 1, 1971], the Consumer Protection Office filed a motion to dismiss without prejudice stating it had doubts as to whether the compromise agreement has in fact been breached as alleged in the petition. The Judicial Officer, accordingly, dismissed the petition without prejudice. [Postal Service Decision at p. 5].

Plaintiff's position, as stated in its Brief (p. 13), is that the advertisements it submitted in October, 1971 were substantially the same as that involved in the present proceeding, and that when the application for dismissal of the administrative complaint was made, the Postal Service somehow impliedly approved the new advertising it had received as not being violative of the June 15, 1971 Compromise Agreement.

I think this casts a false light on the approach lawfully and fairly taken by the Postal Service when it moved to dismiss after having been persuaded that the sales under the old agreement were inadvertent. This action indicated no more than that the Postal Service felt that these sales "were not a proper basis upon which a breach order should be issued." As the Judicial Officer says in his opinion:

. . . While subsequent advertising contrary to the compromise agreement might also be a breach, that was not the breach alleged in the petition. [Postal Service Decision at p. 7].

At most therefore the Postal Service had received, after October 1, 1971, under the name Barbizon rather than Institute for Weight Control, three "revised compliance Ads," two of which did not mention a calorie control plan and one which did, and did nothing with respect to these Ads until the instant proceeding was commenced by filing of the complaint in May, 1972.

I therefore find, as did the Judicial Officer, that assuming that an estoppel can be worked against the United States, where, as here, a substantial public interest is involved, that there were no facts here warranting its application.[6]

---

6. Sanitary District v. United States, 266 U.S. 405, 45 S.Ct. 176, 69 L.Ed. 352 (1925) ; Utah v. United States, 284 U.S. 534, 52 S.Ct. 232, 76 L.Ed. 469 (1932) ;

Further with respect to the matter of estoppel, on oral argument the attorney for the plaintiff attempted to urge the point that, in reliance upon action or inaction by the Postal Service, the plaintiff had undergone considerable financial expense or loss. The fact is however that there is nothing in the record to support this contention. As a matter of fact, as this Court pointed out at the time, it could well be argued that for a period since October of 1971, until the commencement of the administrative proceeding now under review, the advertisement in question, subsequently found to be a material misrepresentation, had been used to considerably enrich the plaintiff, at the expense of a hoodwinked public. It is also clear that there is nothing in the record that the entry of the stop order will, as contended in the plaintiff's Brief, result in "destroying plaintiff's business . . . ."

The plaintiff places primary reliance upon the case of Mark Eden v. Lee, 433 F.2d 1077 (9th Cir. 1970), and seeks to come within its holding. *Mark Eden* does not apply. The distinction is readily defined in the opinion (433 F.2d at 1082–1083) :

> . . . this is not an ordinary postal fraud proceeding, but rather a proceeding to determine whether there has been a breach in the settlement agreement as contained in the Affidavit of Discontinuance. We are not concerned with the question of whether there were fraudulent representations with intent to deceive, but rather with the interpretation of the settlement agreement . . . . [footnotes omitted]

The court in *Mark Eden* also stated (433 F.2d at 1083, n. 15):

> Nor are we concerned with the truth or falsity of the representations in the various advertisements or the efficacy of the devise manufactured by Mark Eden and its Bustline Contour

Course. As the Judicial Officer well said, 'It should be thoroughly understood that no statement in this decision is intended, nor should it ever be construed, in any way to be a judgment as to the truth or falsity of any representations—past, current or future, used or to be used by the Respondent in the sale of the device and the program.'

The court examined an agreement in compromise between the parties and found a commitment therein by the Post Office Department to take up with the plaintiff any new advertising violative of the agreement, and give plaintiff an opportunity to revise it prior to issuance of any order based upon any charge that such advertising violated the compromise agreement.

First, the June 15, 1971 Compromise Agreement embodied no such provision. Second, the administrative proceeding here on review was not founded upon breach of the June 15, 1971 Compromise Agreement, but rather an entirely new proceeding. Moreover, plaintiff here concedes that its new advertising was never formally approved by the Postal Service.

Accordingly, *Mark Eden* offers no support for plaintiff's position.

■ Plaintiff next urges that the Judicial Officer erred in refusing to order production of the Post Office files relating to the complaint against plaintiff and the discussions relative to the June 15, 1971 Compromise Agreement.

Plaintiff's motion for the files was made near the close of the hearing, and without compliance with regulations governing production of such files. *See* 39 C.F.R. § 261. The record indicates that Postal Service offered to consider any specific request for specific documents; however, the plaintiff refused to be specific, but rather insisted on obtaining the complete file, which the Postal Service contended contained Inspection Serv-

Matter of Double H. Products Corp., 462 F.2d 52 (3d Cir. 1972) ; Insurance Co. of North America v. McCleave, 462 F. 2d 587 (3d Cir. 1972) ; 2 Davis, Administrative Law Treatise (1958), § 17.01, 491.

ice investigative reports, among other things. Such investigative materials are exempted from disclosure by 39 U.S.C. § 410(c)(6) and 5 U.S.C. § 552.

The Judicial Officer stated that his ruling of nondisclosure would not prejudice the right of plaintiff to make appropriate demand in accordance with appropriate published regulations. *See* 39 C.F.R. § 261. However, plaintiff never made such an administrative request, and plaintiff's argument that there was insufficient time to do so must be dismissed as specious.

Next it is urged that the Judicial Officer abused his discretion in denying without opinion plaintiff's motion to modify the type of mail stop order issued. The fact is that the Judicial Officer did issue an opinion which is part of the administrative record herein.

Plaintiff had moved that, in lieu of the stop order, it be allowed to communicate with prospective customers, whose responses to plaintiff's advertisements are presently being held by the Postal Service, so as to bring to their attention the necessity for using plaintiff's diet plan. The Postal Service had urged that such a communication by plaintiff addressed to prospective customers would be inappropriate in that it would imply a Postal Service finding that the diet plan was safe and effective; that such a mailing could not dispel the false impressions already cast by the false advertising; and that the motion was predicated on an assumption that the plaintiff's product had some efficacy, which had been demonstrated to be unfounded.

I find that the Judicial Officer acted properly in denying this motion, and in accordance with the public interest, for the very reasons advanced by the Postal Service.

In view of my having found substantial evidence in the record to support the administrative determinations of the Judicial Officer, that his decision was otherwise in accordance with law, and having determined that there is no material fact in dispute between the parties insofar as the scope of my review is concerned, summary judgment shall be entered in favor of the defendants, and plaintiff's motion for summary judgment shall be denied, with costs to defendants. The form of order, to be submitted within five days, shall include provision for vacating of the preliminary injunction previously entered herein by me by order filed on June 16, 1972, so that the defendants are free to proceed pursuant to statute.